Ronald W. BROWN, Plaintiff,

v.

DELTA AIR LINES, INC., Defendant.

Civ. A. No. 76–H–1963.

United States District Court,
S. D. Texas,
Houston Division.

Dec. 31, 1980.

Gordon Cooper, Houston, Tex., for plaintiff.

Richard R. Brann, James T. McCartt, Baker & Botts, Houston, Tex., Gregory L. Riggs, Atlanta, Ga., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

### Introduction

Plaintiff, Ronald Brown, a black male, brought this employment discrimination action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1978), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1974), on behalf of himself and, pursuant to Rule 23(a) and 23(b)(2), Fed.R.Civ.P., on behalf of all other Blacks who have been discriminated against by the defendant, Delta Air Lines, Inc. On February 22, 1980, the Court provisionally certified a class consisting of:

> Delta employees in the Stations Department at Houston Intercontinental Airport—i. e., all Delta employees at Houston Intercontinental except those in the Maintenance, In-Flight Service, Flight Operations and Stores Departments.

Order, *Brown v. Delta Air Lines, Inc.*, H–76–1963 (S.D.Tex. February 22, 1980). By Order of June 27, 1980, the Court excluded rejected applicants from the class.[1]

I. Plaintiff now requests the Court to recertify the class to include "all employees in all departments of Delta at Houston Intercontinental Airport". Plaintiff's Post Trial Brief at 2, 3. The law is clear that in order for a suit to be maintained as a class action, each of the four requirements specified in Rule 23(a) must be satisfied. Where the Court has certified a plaintiff class, as was done here, and the plaintiff seeks to expand the class, the plaintiff bears the burden of satisfying the same four requirements. If any one of the four requirements is not met, the Court must refuse to certify the class. *See Huff v. N. D. Cass Co. of Alabama*, 485 F.2d 710, 712 (5th Cir. 1973).

Plaintiff is not a member of the class of employees he seeks to have included in the existing class because he has no claim under either Title VII or Section 1981, and thus does not possess the same interest and suffer the same injury as employees in other departments of the defendant's Houston office. *See* Conclusions of Law 5, 8; *see also East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). Plaintiff's lack of affinity can be taken into consideration as a factor in determining a motion for class recertification, because it shows plaintiff's lack of nexus with the class. "It is the lack of nexus, rather than a lack of merit to [his] claim of discrimination, that proves [he] is not a proper class representative." *Camper v. Calumet Petrochemicals, Inc.*, 584 F.2d 70 (5th Cir. 1978). Plaintiff's claims are further not typical of the claims of the proposed members of the class for a number of reasons: (1) all departments within the defendant's Houston office are operated under a separate organizational hierarchy and utilize separate operational manuals (commonly referred to as Standard Practice Guides); thus, promotional and employee utilization decisions are made on a departmental basis; (2) plaintiff never has been employed in, nor has he sought a promotion or transfer to any of the departments which he now seeks to represent; and (3) plaintiff produced no evidence at trial which would be relevant to his discrimination allegations for any class of employees other than those in the Stations department of defendant's Houston office. Accordingly, no evidence was presented to establish any "nexus" between the plaintiff's claim of discrimination and the discrimination allegedly practiced against employees in other departments. *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895 (5th Cir. 1978); *Consor v. Occidental Life Insurance Company of California*, 469 F.Supp. 1110 (N.D.Tex.1979). Accordingly, the Court denies plaintiff's motion to recertify the plaintiff class.

The cause was tried to the Court without a jury from August 5 to August 22, 1980. At the conclusion of the evidence on liability, the Court requested additional briefing by the parties and took the case under advisement. Pursuant to Rule 52, Fed.R. Civ.P., the Court hereby enters its Findings of Fact and Conclusions of Law detailing the reasons for its conclusion that plaintiff has failed to sustain his burden of proving that he or the plaintiff class has been discriminated against by defendant on the basis of race, and that as a consequence the defendant should prevail.

## II. Findings of Fact

### A. Ronald W. Brown's Individual Claim

1. Plaintiff, Ronald W. Brown, is a black male citizen of the United States and a resident of Houston, Harris County, Texas.

2. Defendant, Delta Air Lines, Inc., is a duly incorporated organization, authorized to do business within the State of Texas, and is an employer within the meaning of 42 U.S.C. § 2000e (1978).

3. Plaintiff Brown initially was hired by defendant on or about October 9, 1972, as a Customer Service Agent (hereinafter CSA) at the Houston Stations Department of the defendant. Testimony of Ronald Brown; Testimony of Dale Harper; Defendant's Exhibits 1, 14. Plaintiff's duties as a CSA assigned in the ramp services area included the following: preparing the ramp area for flight arrival; separating cargo by type and destination; performing service checks on support equipment and vehicles; inserting and removing wheel chucks and gear-lock pins; unloading and loading cargo manually and with loading systems; observing loading restrictions and limitations; delivering and transferring cargo to customers, other flights and airlines; and performing additional related assignments when necessary. Testimony of Ronald Brown; Defendant's Exhibit 9c.

At certain times throughout his employment as a CSA, plaintiff was assigned to work in the cabin services area of the defendant, where his duties included the interior cleaning of aircraft cabins, the replenishing of depleted supplies on the aircraft, as well as the servicing of water and lavatory facilities. Testimony of Ronald Brown; Defendant's Exhibit 9c. Also for a short period of time, plaintiff was assigned to work on the load desk in the operation services area. Plaintiff's duties on the load desk included the calculation of take-off weight data, and the teletype transmission of operational and maintenance messages. Testimony of Ronald Brown; Defendant's Exhibit 9c.

4. Defendant employs a policy of evaluating its employees on a periodic basis. In defendant's Standard Practice Guide, defendant has delineated a formalized evaluation process, complete with standardized forms and accompanied by instructions for their use. Testimony of Dale Harper; Testimony of Ronald Brown; Defendant's Exhibits 6, 7.

5. During his employment with the defendant, the plaintiff was evaluated formally by his supervisors on numerous occasions. The evaluations received by plaintiff reflect that the quality of the plaintiff's work performance was somewhat erratic. Testimony of Dale Harper; Testimony of A. C. Pickert; Defendant's Exhibit 1. Initially his work performance was acceptable, and on several occasions plaintiff received the commendations of his supervisors. Testimony of Ronald Brown; Testimony of Dale Harper; Testimony of A. C. Pickert; Testimony of William Cannon; Defendant's Exhibit 1. At other times, however, plaintiff's work performance was unsatisfactory. Testimony of Dale Harper; Testimony of A. C. Pickert; Testimony of Harry Foster; Testimony of Louis Casinger. The testimony elicited at trial, together with plaintiff's periodic performance evaluations, reveals that his potential for advancement with defendant was recognized, but also that he often was criticized for lack of attention to his duties, unwillingness to cooperate with supervisors and fellow employees, inability to accept constructive criticism, and of the utmost concern to the defendant, plaintiff's

record of absenteeism.[2] Testimony of Dale Harper; Testimony of A. C. Pickert; Testimony of Louis Casinger; Testimony of Harry Foster; Defendant's Exhibit 1.

6. On numerous occasions throughout his employment, plaintiff was counseled by his supervisors concerning his job performance. He repeatedly was encouraged to improve his performance and after each counseling session, the plaintiff's performance would improve noticeably. Soon thereafter, however, the quality of plaintiff's performance would deteriorate and become erratic once again. Testimony of Dale Harper; Testimony of A. C. Pickert; Defendant's Exhibit 1.

7. Defendant employs a policy of attempting to fill vacancies with qualified persons already employed by the defendant. Testimony of Dale Harper; Testimony of R. E. Ealey; Defendant's Exhibit 4. In implementing this policy and in making the determination as to which applicants are the best qualified, the defendant consults the applicant's personnel records and supervisors. Accordingly, an applicant's work performance and attendance records are very important. Testimony of Dale Harper; Testimony of R. E. Ealey; Defendant's Exhibit 4.

8. On a number of occasions plaintiff submitted requests for promotions to various positions within the defendant.[3] Plaintiff became aware of these openings through a company procedure by which all openings within the defendant are posted in its various offices throughout the country. Testimony of Ronald Brown; Testimony of Dale Harper; Testimony of R. E. Ealey; Defendant's Exhibit 45.

9. Although occasionally plaintiff was afforded the opportunity to travel at defendant's expense to Atlanta to interview for vacant positions, plaintiff's requests for promotions always were denied. Testimony of Ronald Brown; Testimony of Dale Harper.

10. The decisions not to promote plaintiff always were made by defendant's management personnel. Based on plaintiff's periodic evaluations, plaintiff's personnel file, and the observations by various supervisors of the plaintiff, defendant's management personnel concluded that plaintiff lacked the necessary qualities and skills to merit promotion. Testimony of Dale Harper; Testimony of A. C. Pickert; Testimony of R. E. Ealey; Defendant's Exhibit 1. As previously indicated, the quality of plaintiff's work performance was erratic and his attendance record was substandard. Refer to Findings 5, 6.

11. Plaintiff, believing that he and his fellow black co-workers were being denied promotions and were being treated discriminatorily and harassed, filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter EEOC), on January 26, 1976. Plaintiff's Exhibit 1. On August 31, 1976, the EEOC issued its "Notice of Right to Sue Within 90 Days". Plaintiff's Exhibit 5.

12. From January 26 through April 16, 1976, defendant was absent from work due to the recurring effects of an injury that

---

2. A review of the plaintiff's attendance record from October 9, 1972 to June 21, 1976, revealed the following amounts of lost time due to absences:

    10/9/72 to 10/8/73—41.1 hours
    10/9/73 to 10/8/74—272.5 hours
    10/9/74 to 10/8/75—326.0 hours
    10/9/75 to 6/21/76—560.0 hours
Defendant's Exhibit 1.

3. In addition to promotions to positions located outside of the Houston Stations Department, plaintiff made a number of requests seeking a promotion from Customer Service Agent (hereinafter CSA) to Senior CSA. Eligibility for promotion from CSA to Senior CSA is established (after a minimum of 18 months as a CSA) in one of two ways: (1) demonstrated leadership ability and outstanding performance as a "Working Group Leader" in a functional area of the Stations Department; or (2) satisfactory completion of assignment as a CSA to two or more functional areas of the Stations Department. No requirement is imposed that a vacancy exist before a qualified CSA can be promoted to Senior status. The duties of a Senior CSA are not different from those duties performed by a CSA. The only differences between the two positions are that a Senior CSA earns a higher salary and is eligible for promotion to the lowest supervisory position, lead CSA.

the plaintiff had sustained on a prior occasion while in the defendant's employ. Testimony of Ronald Brown; Testimony of Dale Harper; Defendant's Exhibit 1. From his return to work on April 17 until the time of his final evaluation on June 3, 1976, plaintiff had worked a total of 28 days for the year 1976. Testimony of Dale Harper; Defendant's Exhibit 1.

13. On June 3, 1976, Glyn Grimes, plaintiff's immediate supervisor for the period from April 17 to June 3, conducted an evaluation of plaintiff's work performance. In that evaluation, Mr. Grimes noted that "continued good work habits will lead to promotion as a Senior Customer Service Agent." Testimony of Glyn Grimes; Defendant's Exhibit 1. Shortly after the evaluation on June 3, Mr. Grimes recommended that plaintiff be considered for promotion to Senior CSA. Upon receiving Mr. Grimes' recommendation, Mr. Harper, defendant's Houston Station Manager, conducted a survey among several of plaintiff's supervisors to determine the accuracy of the June 3 evaluation and the subsequent recommendation.[4] Testimony of Dale Harper; Defendant's Exhibit 1. The survey reflected that none of the plaintiff's supervisors, including Mr. Grimes, were particularly enthusiastic concerning plaintiff's promotability at that time. Testimony of Dale Harper; Testimony of Glyn Grimes; Testimony of Louis Casinger; Testimony of William Cannon; Testimony of Harry Foster; Defendant's Exhibit 1. The fact that plaintiff had worked a total of 33 days during 1976, coupled with the negative comments from plaintiff's supervisors, prompted Mr. Harper to inform the plaintiff that he would be considered for a promotion if he could perform his job satisfactorily for three months. Testimony of Dale Harper; Testimony of Glyn Grimes; Defendant's Exhibit 1.

14. While the evidence does not indicate the quality of plaintiff's work performance for the remainder of June, the evidence does indicate that plaintiff was absent from work for two days. Defendant's Exhibit 1. On June 22, Mr. Harper spoke with plaintiff concerning his continuing unsatisfactory attendance record, and on June 30, Mr. Harper gave plaintiff a final warning in the form of a "last chance letter"[5] advising plaintiff that unless his attendance record improved, he would be terminated. Testimony of Ronald Brown; Testimony of Dale Harper; Defendant's Exhibit 1, 2a, 43.

15. At the time plaintiff was given the "last chance letter", as well as throughout his employment with the defendant, plaintiff constantly was informed that the structure of defendant's operational staff was skeletal in nature, and thus dependent upon its employees' attendance.[6] Testimony of

---

4. Plaintiff challenges the survey conducted by Mr. Harper as being highly unusual and infers that it is evidence of defendant's discriminatory practices. The plaintiff fails to note, however, that Mr. Harper conducted a similar survey concerning the promotability of Ron Chesser, a white CSA, who had been in defendant's employ as a CSA since November 1, 1972. Testimony of Dale Harper; Defendant's Exhibits 33, 38. Further, part of Mr. Harper's duty as Station Manager is to ensure that only qualified employees will be awarded promotions. Testimony of Dale Harper; Defendant's Exhibits 3, 4, 7.

5. Dale Harper testified that at the time plaintiff was given the "last chance" letter on June 30, plaintiff was placed automatically on six months probation. Testimony of Dale Harper; Defendant's Exhibit 43.

6. Mr. Richard Ealey, defendant's Director of Equal Employment Opportunity (hereinafter EEO), testified concerning defendant's heavy emphasis on its employees' attendance. Because the airline business is cyclical and prone to retrenchment in times of recession, layoffs are common throughout the industry during economic downturns. Defendant's policy is to avoid layoffs, and one of its means of maintaining a stable workforce in bad economic times as well as good is to employ only the minimum number of personnel required to perform the necessary tasks. This "leanness", as Mr. Ealey described it, is a double-edged sword for the company's employees. On the one hand, it provides job security for personnel during economic recessions. On the other hand, it requires employees to keep good attendance records in order to maintain the company's avowed high standards of efficiency and passenger service and to avoid placing an undue burden on co-workers. Employees with poor attendance, regardless of the legitimacy of their reasons, are understandably less valuable to the company than those who report for work every day and carry their share of the work-

Dale Harper; Testimony of A. C. Pickert; Defendant's Exhibit 1.

16. On July 26, 1976, an incident occurred between plaintiff and one of his supervisors which ultimately led to plaintiff's discharge. Plaintiff had reported for work allegedly ten minutes late. Subsequently, one of plaintiff's supervisors, Rod McNevin, the shift coordinator, met with plaintiff to discuss plaintiff's tardiness. In that conversation, Rod McNevin mistakenly informed the plaintiff of the existence of a sign-in policy that all employees were required to follow. Plaintiff, knowing that no such policy existed, became highly argumentative and belligerent. At one point during the ensuing argument between the two men, Mr. McNevin informed the plaintiff that he would send him home if plaintiff did not stop arguing and return to work. Plaintiff, however, steadfastly refused and thereupon threatened Rod McNevin. Testimony of Ronald Brown; Testimony of Rod McNevin; Testimony of Marvin Nichols; Defendant's Exhibit 1.

17. The incident between the plaintiff and his supervisor was reported to Mr. Harper on July 30. Subsequently, Mr. Harper conducted an investigation into the circumstances surrounding the incident, obtaining written reports and information from anyone who had witnessed the event. Later that same day, Mr. Harper telephoned plaintiff at his home and informed him that he was being placed on suspension pending an investigation of the matter. Plaintiff further was requested to meet with Mr. Harper on August 2 to discuss plaintiff's version of the incident. At the conference on August 2, plaintiff was asked to submit a written version of the occurrence so that the report could be sent to Atlanta along with plaintiff's personnel file. Testimony of Dale Harper; Testimony of Ronald Brown; Defendant's Exhibit 1.

18. Following the conference on August 2, Mr. Harper recommended to his supervisors in Atlanta that plaintiff be asked to resign or be terminated. This recommendation, along with plaintiff's written account of the incident and his entire personnel file, was forwarded to defendant's home office in Atlanta and reviewed by several levels of management.[7] Testimony of Dale Harper; Testimony of R. E. Ealey; Defendant's Exhibits 1, 2a–c. The general consensus of those in Atlanta who had reviewed plaintiff's file was that plaintiff be terminated, either through his resignation or discharge. Testimony of R. E. Ealey; Defendant's Exhibits 1, 2a–c. Shortly thereafter, defendant's Houston Station assistant manager, A. C. Pickert, met with plaintiff and asked for his resignation. On August 10, 1976 plaintiff tendered his resignation. Testimony of Ronald Brown; Testimony of A. C. Pickert; Defendant's Exhibit 1.

19. On January 14, 1977, plaintiff filed a second Charge of Discrimination with the EEOC, alleging that he was discharged on the basis of his race. Plaintiff's Exhibit 4. Plaintiff received a second "Notice of Right to Sue Within 90 Days" on February 17, 1978. Plaintiff's Exhibit 6.

### B. Class Claims

20. Since the defendant has a policy of filling job vacancies with persons already in its employ, defendant rarely hires persons from the public at large. Testimony of Dale Harper; Testimony of R. E. Ealey. When the defendant does find such procedure necessary, prospective employees submit applications to the defendant's branch office nearest them. Employment procedures then are coordinated through the defendant's personnel office in Atlanta. Tes-

---

load. Accordingly, employees with excellent attendance tend to be favored over those with frequent and extended absences.

**7.** Mr. Harper's recommendation and plaintiff's entire personnel file were reviewed by the following persons in defendant's home office in Atlanta: the Regional Manager of Stations, Gene Anderson; the System Manager, Jack McGuire; the Administrative Assistant of Personnel, Peter Caldwell; the Manager of Equal Employment Opportunity, R. E. Ealey; the Vice President of Personnel Benefits, J. A. York; and finally, by the Senior Vice President of Personnel for Delta Air Lines, R. W. Allen. Testimony of R. E. Ealey; Defendant's Exhibits 2b–c.

timony of Dale Harper; Testimony of R. E. Ealey; Defendant's Exhibit 5.

21. The evidence introduced at trial [8] revealed that almost all of those employees hired at the Houston Stations Department during the subject period were hired into three temporary positions. Those employees were then promoted into permanent positions when permanent positions became available. Testimony of Dale Harper; Defendant's Exhibits 53a, 54a, b, d.

22. From November 30, 1974 through December 31, 1979, defendant hired 106 employees in the Houston Stations Department. Defendant's Exhibit 54a. Of those initial hirees, only two persons were hired directly into permanent positions. Those two persons were hired into permanent Junior Cargo Clerk positions in 1979. Defendant's Exhibits 53a, 54a. The remaining 104 entered three temporary positions: Customer Services Support Agent-Temporary Full Time (hereinafter CSSA–TFT); Customer Service Agent-Temporary Part Time (hereinafter CSA–TPT); and Customer Services Support Agent-Temporary Part Time (hereinafter CSSA–TPT). Defendant's Exhibits 53a, 54a–b. Very few Blacks were hired into CSA–TPT positions; instead, the majority of Blacks hired were assigned into CSSA–TPT or CSSA–TFT positions. Defendant's Exhibits 54a–b. The CSA–TPT positions, however, are not necessarily the superior, more desirable temporary positions. Several facts illustrate this: (1) an employee makes less money as a CSA–TPT than as a CSSA–TFT,[9] Testimony of Carl Hoffman; (2) though CSA–TPT positions are offered to CSSA–TPT employees before anyone is hired from the public at large, only one person has chosen to move into a CSA–TPT position, Defend-

---

**8.** During the trial of the case, both parties submitted statistical evidence in support of their respective positions. Both parties gathered their statistical data from the same source, the "white sheets" provided by the defendant's home office in Atlanta. Defendant's Exhibit 52. These "white sheets" contained certain relevant employment information about persons employed by the defendant, both formerly and currently, during the subject period.

The first set of "white sheets" provided to plaintiff's attorney in March, 1980, did not indicate the positions of most of the defendant's Houston Station employees as of November 11, 1974. This omission was explained to plaintiff's attorney and one week later, the omitted information was supplied. See Defendant's Exhibit 25.

During the plaintiff's case, plaintiff's expert, Ms. Betty Goldsberry, acknowledged under cross-examination that she had failed to include the information contained in defendant's exhibit 25 in compiling the data for plaintiff's exhibits. As a consequence, many of plaintiff's exhibits erroneously indicate an individual's first promotion after November 30, 1974 as a promotion from his "initial position with Houston Stations Department." Thus, plaintiff's exhibits reflect several aberrant instances of employees skipping up the promotional ladder. For example, plaintiff's exhibit 29 shows employees promoted directly to Coordinator from CSA, or directly from CSA to Supervisor of a Major Area without ever occupying any of the intervening, lower-level jobs. Without question, the evidence indicated that such skipping never occurred. However, it might appear to have occurred if one considered only the "white sheets" without taking into account the jobs these employees held on 11/30/74 as shown on defendant's exhibit 25. In effect, plaintiff's statistical evidence fails to include the necessary starting position for an accurate analysis of post-November 30, 1974 employee movement.

Further, a comparison of the "white sheets" with the statistical evidence submitted by the plaintiff indicated substantial differences between the number of employees and promotions as contained in those exhibits and the number of employees and promotions as contained in the "white sheets." Compare Defendant's Exhibits 25, 52, 60 with Plaintiff's Exhibits 8, 9, 17–21. Thus, as the omissions and aforementioned errors have tainted all of plaintiff's statistical evidence, the Court finds the statistical evidence to be of no probative value and a useless foundation upon which to conduct a meaningful analysis of plaintiff's class claims. See EEOC v. Datapoint Corp., 570 F.2d 1264, 1269 (5th Cir. 1978) ("statistics must be relevant, material and meaningful, and not segmented and particularized and fashioned to obtain a desired conclusion"); Robinson v. Union Carbide Corp., 538 F.2d 652, 658 (5th Cir. 1976), cert. denied, 434 U.S. 882, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977); Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1371 (5th Cir. 1974). The Court instead relies on defendant's statistical evidence.

**9.** Temporary employees are paid at the same hourly rate as employees in the corresponding permanent positions. Testimony of Dr. Carl Hoffman.

ant's Exhibit 55; (3) while thirteen CSA–TPT employees have accepted moves into CSSA–TFT positions, none have moved from CSSA–TFT positions into CSA–TPT positions. Defendant's Exhibit 55; (4) employees in CSSA–TFT and CSSA–TPT positions advanced into permanent positions more quickly than employees in CSA–TPT positions, Testimony of Dr. Carl Hoffman; Defendant's Exhibits 54B, 54e; (5) of the fourteen employees hired in the subject period who had not moved into permanent positions by December 12, 1979, twelve of these employees, eleven of whom were white, were in CSA–TPT positions. Defendant's Exhibit 54b.

23. Of the 104 persons hired into temporary positions, 53 were promoted into permanent positions, Testimony of Dr. Carl Hoffman and Defendant's Exhibits 54c–e, indicating an overall success rate of 51%. Testimony of Dr. Carl Hoffman; Defendant's Exhibit 54d. Further analysis of the relevant data indicates that 70% of those Blacks hired into temporary positions achieved permanent status, as opposed to a success rate of 45.9% for white persons in temporary positions. Defendant's Exhibits 53a, 54b, 54d.

24. With regard to the average rate of advancement of black employees in temporary positions compared to white employees in temporary positions, the evidence reveals that black employees in temporary positions achieve permanent status at a faster rate, in 5.14 months as opposed to the 5.85 months it takes for white employees to achieve permanent status. Defendant's Exhibit 54e.

25. The initial position for almost all of the employees in temporary positions who achieve permanent status is the Customer Services Support Agent position.[10] Defendant's Exhibits 53a, 54b–c.

26. Promotions within the defendant are based upon the individual employee's qualifications, work performance skills displayed by the employee in his current position, seniority, and recommendations of the employee's supervisors. Testimony of Ronald Brown; Testimony of Dale Harper; Testimony of R. E. Ealey; Defendant's Exhibits 5–7.

27. Employees of the defendant become aware of vacancies through a company posting procedure. Periodically, the defendant publishes a bulletin containing a list of all those vacancies existing in all of the defendant's offices. Defendant's Exhibit 61. These bulletins then are posted in each of defendant's branch offices. Those employees who desire to apply for the vacant position do so by submitting a bid. These bids are collected from defendant's branch offices and sent to defendant's home office in Atlanta. The personnel division then chooses several of the most qualified applicants for a final interview in defendant's Atlanta office. The travel expenses of the applicants are paid for by the defendant. Following this interview, the most qualified applicant is chosen to fill the vacancy. Refer to Finding 26; Testimony of Ronald Brown; Testimony of Dale Harper; Testimony of R. E. Ealey.

28. Relevant statistical data concerning the promotional progression of permanent employees with the defendant for the subject period of time were contained in several of defendant's exhibits. Defendant's Exhibits 13a–f. Defendant's statistical expert witness, Dr. Carl Hoffman, then performed several analyses of said promotional data in those exhibits. Testimony of Dr. Carl Hoffman.

Dr. Hoffman testified that the underlying assumptions of Exhibits 13a–f are the following: first, that promotions of employees with the defendant should occur in a totally random manner, without regard to race, seniority, background or any other factor; and second, that promotions will be awarded in a pattern that reflects the racial composition of the relevant employee pool.[11]

Analyzing each of the seven separate promotional steps as set forth in Defendant's

10. The one exception was Douglas Holt who was the only person to bid on a CSA-permanent employee-provisional position. Testimony of A. C. Pickert; Defendant's Exhibit 54b.

11. The promotional progression of employees within defendant's Houston Stations Department is illustrated by Defendant's Exhibit 8. The term "pool" as used by the parties in this

Exhibit 13, Dr. Hoffman performed a "hypergeometric test" [12] to calculate the precise probability that random decision-making would render the observed number of black promotions, and to see whether the difference from the expected number was statistically significant. [13] The hypergeometric analysis revealed that in no promotional step was the underrepresentation of Blacks statistically significant. Those differences that did exist were well within the .05 range.

29. After applying the hypergeometric test to each promotional step, Dr. Hoffman applied "Fisher's transformation" to cumulate the data in all seven. This test was performed in order to ensure that a pattern of insignificant differences within the individual steps did not mask systematic bias along the whole promotion ladder. Again, the test results revealed that any cumulative variation from the random model was well within the .05 range. [14] Testimony of Dr. Carl Hoffman. After conclud-

case and by the Court in its Findings of Fact and Conclusions of Law refers to that classification from which employees normally are drawn for promotion to a higher level position. In defendant's promotion-from-within scheme, the position of Customer Service Support Agent (CSSA) defines the pool for promotion to Senior Customer Service Support Agent (Senior CSSA); both Senior CSSA and CSSA serve as pools for promotion to CSA; CSA is the pool for promotion to Senior CSA; Senior CSA is the pool for promotion to Customer Service Supervisor (CSS); and CSS is the pool for promotion to Supervisor and Coordinator. Testimony of Dale Harper; Testimony of Dr. Carl Hoffman; Defendant's Exhibit 8.

12. Dr. Hoffman explained that the hypergeometric test is more sensitive to differences from the expected result than the "binomial test" utilized in *Castaneda v. Partida*, 430 U.S. 482, 496–97 n.17, 97 S.Ct. 1272, 1281 n.17, 51 L.Ed.2d 498 (1977), and *Hazelwood School District v. United States*, 433 U.S. 299, 308–09 n.14, 97 S.Ct. 2736, 2741–42, n.14, 53 L.Ed.2d 768 (1977).

13. Dr. Hoffman testified that the concept of "statistical significance" is based upon "random hypothesis"; that is, promotions from any relevant pool should occur in a random manner, without regard to race or any other factor. Even where promotion decisions are made solely by chance, however, one cannot expect results that exactly reflect the racial composition of the employee pool. Rather, one can only expect a result that falls within the distribution of promotions that random decision-making would generate in a large number of trials. Accordingly, the random hypothesis can be rejected if the observed result falls so near the edge of that distribution that it is "significantly" different from the expected result. By analogy, a person's suspicions might not be aroused if 20 flips of a coin yielded only 8 or 9 heads, rather than 10; however, a total of only 1 or 2 heads might well be such a significant variation from the expected number that one might think that the coin is unfair. Testimony of Dr. Carl Hoffman.

Dr. Hoffman further testified that with a test of statistical significance, one can determine the probability that the observed value could have happened by chance, i. e., the probability that in a random sample of an appropriate test population the variable would exhibit a value as extreme as that observed. A test of statistical significance is thus based on the results of a hypothetical experiment. Suppose that an infinite number of samples of the same size are drawn from the test population. The probability of the observed value occurring by chance is equal to the proportion of the samples in which the value is at least as extreme as the observed whole. It has become a convention in social sciences to accept as statistically significant values which have a probability of occurring by chance 5% of the time or less. Testimony of Dr. Carl Hoffman. *See generally* N. Nie, C. Hull, J. Jenkins, K. Steinbrenner, & D. Bent, Statistical Package For the Social Sciences 222 (2d ed. 1975). *See Castaneda v. Partida*, 430 U.S. 482, 496 n.17, 97 S.Ct. 1272, 1281 n.17, 51 L.Ed.2d 498 (1977); and *Hazelwood School District v. United States*, 433 U.S. 299, 308–09 at n.14, 97 S.Ct. 2736, 2741–42 at n.14, 53 L.Ed.2d 768 (1977), in which the Supreme Court recognized the .05 level of significance.

14. "Fisher's transformation" eliminates the possibility that several samples, each with an independent variation that is not statistically significant, might reveal cumulatively a significant bias. For example, consider a coin that yields 5 heads in a trial of 8 flips. Though the result would vary from the expected result (4 heads), such a small number of flips would certainly not warrant any inference that the coin is not "fair." If, however, 5 or 6 subsequent trials yielded the same variance (5 heads rather than 4), one would begin to suspect that the coin is not fair. Thus, even though each trial yielded results consistent with fairness, the cumulative experience would suggest unfairness after all.

Similarly, in the promotion context, the experience at each rung of the promotion ladder might tend to disfavor Blacks, but not so much

ing "Fisher's transformation" test, Dr. Hoffman analyzed each promotional step separately, utilizing "Fisher's exact test".[15] As before, Dr. Hoffman found that at each promotion level, the variation from expectation was not statistically significant. Testimony of Dr. Carl Hoffman; Defendant's Exhibits 13a–f.

30. Between November 30, 1974 and December 31, 1979, there were 157 promotions among permanent employees in the Houston Stations Department. Defendant's Exhibits 8, 13a–f, 56. Of those promotions awarded, Blacks could have expected to receive 39.8. The evidence indicates that Blacks received 38. Thus, Blacks were "down" only 1.8 promotions over the five year period. Defendant's Exhibits 56, 13a–f. Dr. Hoffman testified that such a difference was not statistically significant.

31. During the relevant time period, 27 persons were promoted to CSA positions. Of those 27 promotions, 15 persons were formerly CSSA and 12 persons were formerly Senior CSSA. Defendant's Exhibits 13a–b. Defendant's Exhibit 58a lists the 27 persons promoted to CSA in chronological order according to the dates on which they initially were hired, and the dates they were promoted to CSA. The exhibit then indicates for each individual the magnitude by which his position in the hiring queue exceeds or falls short of his position in the promotion queue. If a person exceeds his hiring queue, he is given a positive sign. If a person falls short of hiring queue, he is given a negative sign. Defendant's Exhibit 58b lists the same 27 persons in chronological order according to the dates that they obtained CSSA status and the dates they were promoted to CSA. Again, the exhibit indicates the extent the individual's position in the entry-into-CSSA queue exceeds or falls short of his position in the promotion queue.

Similarly, Defendant's Exhibit 59a contains hiring and promotion to Senior CSA queues for the 72 persons promoted to Senior CSA; Exhibit 59b contains information concerning entry-into-CSA and promotion to Senior CSA queues for the same group.[16]

32. Dr. Hoffman testified that he performed three different tests on the queueing data, in increasing order of sensitivity: the "runs" test; the "difference in proportions" test; and the "sign rank" test. Testimony of Dr. Carl Hoffman; Defendant's Exhibits 58a–b, 59a–b. To conduct the "runs" test, Dr. Hoffman examined the number of positive and negative values assigned Blacks on each exhibit. Random hypothesis would suggest that half of the Blacks would have positive values, while the other half would have negative values. By comparing the observed results with a binomial distribution, Dr. Hoffman testified that he was able to determine that Blacks were not at a statistically significant disadvantage in either Exhibit 58 or 59.

Dr. Hoffman next conducted the "difference in proportions" test, a test more sensitive than the "runs" test,[17] in order to com-

---

as to warrant rejection of the random hypothesis. Nonetheless, a cumulative look at the whole ladder, via Fisher's transformation, might reveal that randomness could not explain such a trend among the several rungs considered together. Obviously, Fisher's transformation increases the sensitivity to any bias against Blacks. Moreover, Dr. Hoffman's use of a one-tailed, rather than two-tailed, test favors the plaintiff's viewpoint even further (because with a one-sided test, it takes less of a variation from expectation to reach ".05 significance").

**15.** Dr. Hoffman used "Fisher's exact test" to calculate the precise probability of the observed occurrences within each promotion rung for each year. He then used "Fisher's transfor-

mation" to cumulate the probabilities within each promotion rung over all 5 years.

**16.** If a promotional scheme was affected by racial discrimination, the results of tests performed on the promotional data would indicate that Blacks' positions in the promotional queue fall consistently below their positions in the hiring queue.

**17.** The "difference in proportions" test is more sensitive in two ways. First, it is more precise because of the greater numbers used—all employees, not just Blacks. Second, it addresses the possibility that more than 50 percent of the total group has one sign (because, e. g., of the absolute magnitude of a few of the " + " or "–" values). Suppose, for instance, that half of the

pare the proportion of Blacks who were given positive values with the proportion of Whites who were given positive values. Again, Dr. Hoffman was unable to detect a significant racial disparity in either of the exhibits.

Finally, Dr. Hoffman applied the "sign rank" test, a test even more sensitive than the prior two. The "sign rank" test takes into account not only the individual's positive or negative value, but also the magnitude of that value.[18] Dr. Hoffman was thus able to compare the distribution of values assigned to Blacks with those assigned to Whites. Once again, Dr. Hoffman was unable to detect any significant

Blacks had " + " signs. That would satisfy the "runs" test; but it would ignore the possibility that far more (or less) than half of the Whites had " + " signs. The "difference in proportions" test takes this possibility into account.

18. The "sign rank" test thus considers the possibility that each Black " + " was small and each Black "–" was large, while each White " + " was large and each White "–" was small.

19. Mr. Ealey's testimony encompassed a discussion of the defendant's equal opportunity policies and programs and the Personnel Department's procedures for hiring, transferring, promoting and disciplining minorities. Mr. Ealey, who is Black, has been the manager of Delta's EEO office since 1972. His general duties include coordinating the company's employment policies regarding minorities and monitoring employment and personnel procedures as they affect minority employees.

Mr. Ealey described in some detail a Consent Decree which took effect in 1973 following negotiations between defendant and the United States Departments of Labor and Justice. This Settlement Agreement, which is enforced by Court Order, is concerned primarily with moving Blacks and females out of jobs which traditionally had been predominantly-Black or predominantly-female. Under the terms of the Agreement, defendant set up a bid system which involved posting notice of job openings throughout all of defendant's branch offices. Refer to Findings 8, 27.

Successful bidders generally are selected on the basis of qualifications. Under the terms of the Settlement Agreement, however, an identified class of minorities and females is actually entitled to preferential treatment. All Blacks and females who were hired prior to July 1, 1971 and who at the time of the Agreement were in traditionally all-Black or all-female jobs are identified as "affected class members." If

difference between the two groups. Testimony of Dr. Carl Hoffman.

33. From November 30, 1974 to December 31, 1979, only five persons were hired or transferred into skycap positions. Each of these employees, all of whom were Black, voluntarily bid out of a position as Senior CSA. Testimony of Dale Harper; Testimony of Dr. Carl Hoffman.

34. No skycap at defendant's Houston Stations Department has attempted to bid out of the position since November 30, 1974, even though these employees have preferential bidding rights under the 1973 Consent Decree. Testimony of Dale Harper; Testimony of R. E. Ealey; Defendant's Exhibit 10a.[19]

a member of the affected class meets only the *minimum* qualifications for a job and has the most company seniority of any affected class member who bids for the job, that person is awarded the position, even though non-members of the affected class who have greater qualifications and more seniority may also bid. Defendant's Exhibit 61. Mr. Ealey explained that all members of the affected class have been advised of their rights under the Consent Decree, and that each class member has signed a statement verifying that he or she understands those rights.

When an affected class member bids successfully on a position and is then either unable to handle the job or does not wish to continue in that position, that person is entitled to "retreat" to the position held prior to the promotion or transfer. No limit is imposed on the number of times an affected class member may exercise this right to retreat from positions obtained by receiving preferential treatment. Employees not of the affected class, however, enjoy no such rights of retreat. If a suitable place cannot be found for non-members of the affected class who fail to perform a job they had bid into, those employees are terminated. Testimony of R. E. Ealey; Defendant's Exhibit 10a.

One of the responsibilities of defendant's EEO office is to monitor the bidding activity of minorities. Mr. Ealey stated that between November 30, 1974 and the present, defendant's Skycap positions at the Houston Airport have been open for bid only twice. He testified that in November of 1977 eight employees had bid for one Skycap position at Houston. Of the eight bidders, all of whom were Black, all but one was employed by defendant in the Houston Stations Department, and six of the eight were Senior CSA with at least seven years seniority. Defendant's Exhibit 62. The job was awarded to Mr. Porter Reese, a Senior CSA who had the

35. In arriving at the above Findings of Fact, the Court has weighed carefully the credibility of the witnesses who have testified and finds that in instances wherein significant factual conflicts exist, the defendant's witnesses are more believable.

### III. Conclusions of Law

1. The Court has jurisdiction over the parties and the subject matter of this suit pursuant to 28 U.S.C. § 1343 (1979), as well as Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (1978), and under the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1974).

2. Defendant is an employer within the meaning of 42 U.S.C. § 2000e (1978).

### Plaintiff's Individual Claims

■ 3. For both his Title VII claim and his Section 1981 claim, plaintiff has the initial burden of presenting a prima facie[20] case of disparate treatment. See, e. g., Crawford v. Western Electric Company, Inc., 614 F.2d 1300, 1315 n.27 (5th Cir. 1980). To meet this burden plaintiff must prove that "actions were taken by the employer from which one can infer, if such actions remained unexplained, that it is more than likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" Furnco Construction Corp. v. Waters, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); McDon-

nell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ 4. With regard to plaintiff's allegation that he was denied promotion due to his race, plaintiff must prove: "(1) that he belongs to a [protected] minority; (2) that he applied for and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applications from persons of [plaintiff's] qualifications." McDonnell Douglas Corp. v. Green, supra at 802, 93 S.Ct. 1824; see also Falcon v. General Telephone Co. of Southwest, 626 F.2d 369 (5th Cir. 1980).

■ 5. Plaintiff clearly satisfies the first McDonnell Douglas requirement. The Court concludes, however, that plaintiff cannot satisfy the second requirement. Although plaintiff had at times achieved a satisfactory level of proficiency in most of the tasks to which he was assigned, the quality of his work performance was erratic. Plaintiff was at times uncooperative with his supervisors and co-workers and unwilling to accept constructive criticism. In addition, plaintiff's evaluation reports reflected a high rate of absenteeism. Refer to Findings 5, 6, 7, 10.

Further, insufficient evidence was presented to support plaintiff's claim that

---

most seniority of all the bidders. Testimony of R. E. Ealey.

In December of 1977, four additional Skycap positions were opened for bidding. Mr. Ealey testified that on this occasion ten employees submitted bids. Nine of the ten were Black. The jobs were awarded to four black Senior CSAs, each of whom had at least seven years seniority. The only white person to bid for the position was a temporary-part-time employee who had been with defendant for only a few months and was therefore not as qualified as the successful bidders. Testimony of R. E. Ealey; Defendant's Exhibit 62. In addition to the five Skycaps who successfully bid into those positions in late 1977, defendant employs ten other Skycaps at the Houston Airport. Mr. Ealey stated that he had examined the bidding activity of those ten employees and found that not a single one of them had bid on any other job in an effort to move out of the Skycap

position, even though all ten were affected class members and thereby entitled to preferential treatment in being considered for other jobs. He explained that, in his experience, it is quite common for persons in Skycap positions to choose to remain in those positions because of the prospect of achieving a high income through tips. Testimony of R. E. Ealey.

20. A prima facie showing pursuant to McDonnell Douglas is not the equivalent of a factual finding of discrimination. "Rather, it is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." Furnco Construction Corp. v. Waters, 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2950–51, 57 L.Ed.2d 957 (1978).

those white employees who were promoted to the positions which plaintiff sought were less or equally as qualified as the plaintiff. Refer to Findings 5, 6, 7, 10. Thus, the Court concludes that plaintiff has failed to establish a *prima facie* case of failure-to-promote on the basis of race.

■■■ 6. If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to "articulate" some nondiscriminatory reason for his action. The Fifth Circuit requires that the employer meet his "burden of proving the legitimate, nondiscriminatory reasons for his actions by a preponderance of the evidence." *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1255 (5th Cir. 1977) *citing McDonnell Douglas Corp. v. Green, supra; Falcon v. General Telephone Company of The Southwest*, 626 F.2d 369 (5th Cir., 1980); *Crawford v. Western Electric Company, Inc., supra*, at 1320; *Burdine v. Texas Department of Community Affairs*, 608 F.2d 563, 567 (5th Cir. 1979) *cert. granted*, 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980); *see also Ray v. Freeman*, 626 F.2d 439 (5th Cir. 1980). The employer, however, "is not required to prove absence of a discriminatory motive." *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) (citation omitted). Moreover, an employer's honest belief in the existence of factors which are nondiscriminatory constitutes a legitimate reason for the employer's acting on that belief. *See Jefferies v. Harris County Community Action Association*, 615 F.2d 1025, 1036 (5th Cir. 1980).

■■ Even assuming that plaintiff introduced sufficient evidence to constitute a *prima facie* case according to the *McDonnell Douglas* standard, the Court concludes that defendant proved by a preponderance of the evidence that the reason for its actions were legitimate and nondiscriminatory. The evidence indicates that during plaintiff's employment with the defendant, plaintiff failed to demonstrate adequate work performance skills or dependability to warrant a promotion to those positions which the plaintiff sought. Refer to Findings 5, 6, 7, 10. Thus, the Court finds that the decision not to promote the plaintiff was based on a good-faith, rational evaluation of the relative qualifications and abilities of the plaintiff and those of the persons ultimately selected for promotion. Refer to Findings 5, 6, 7, 10.

■■■ 7. Since the Court finds that defendant has met its burden of proving a legitimate, nondiscriminatory reason for its actions, the burden shifts to plaintiff to prove by a preponderance of the evidence that the articulated reason for plaintiff's non-selection was merely a pretext for racial discrimination. *Turner v. Texas Instruments, Inc., supra; see also, Burdine v. Texas Department of Community Affairs, supra*. The Court finds no evidence that the reasons articulated for the challenged actions were pretextual;[21] accordingly, plaintiff has failed to satisfy his ultimate burden of establishing that he was discriminated against on the basis of his race on the occasions when he was denied promotion.

### Plaintiff's Discharge

8. The *McDonnell Douglas* standard of order and allocation of proof also is applied in individual cases based on discrimination in discharge. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 281–85, 96 S.Ct. 2574, 2579–81, 49 L.Ed.2d 493 (1976); *Turner v. Texas Instruments, supra*, at 1281–82.

■■ Thus, in order to establish a *prima facie* case, the plaintiff must "meet the initial burden of proving that he was a member of the protected class, that he was discharged, and produce evidence of disparate treatment from which the Court may infer a causal connect between the basis and the discharge." B. L. Schlei and P.

---

**21.** "Pretextual" in this context does not require that plaintiff prove that he was not chosen for promotion solely on the basis of his race without regard to skills and abilities; rather, plaintiff is required to show that his race was a "but for" cause. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282 n.10, 96 S.Ct. 2574, 2580 n.10, 49 L.Ed.2d 493 (1976); *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

Grossman, Employment Discrimination Law, at 511 (1976), *citing McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. *See also Harris v. Plastics Manufacturing Company,* 617 F.2d 438, 440 (5th Cir. 1980) (per curiam); *Green v. Armstrong Rubber Company,* 612 F.2d 967, 968 (5th Cir. 1980) (per curiam).

Although plaintiff meets the first two criteria of the applicable test, plaintiff has produced no evidence that he was terminated because of his race or in retaliation for his having filed an EEOC charge. The evidence revealed that plaintiff was discharged for insubordination. Refer to Findings 16–18. Accordingly, the Court concludes that plaintiff failed to establish a *prima facie* case of racial discrimination based on disparate treatment in his discharge.

9. Even if plaintiff had satisfied the *McDonnell Douglas* criteria, the Court finds that the defendant has satisfied its burden of establishing by a preponderance of the evidence that the decision to terminate the plaintiff was based on a legitimate consideration—insubordination. Refer to Findings 16–18. *See Whiting v. Jackson State University, supra.*

10. Since the Court finds that defendant has met its burden of proving a legitimate, nondiscriminatory reason for its actions, the burden shifts to prove by a preponderance of the evidence that the articulated reason for plaintiff's non-selection was merely a pretext [22] for racial discrimination. *Turner v. Texas Instruments,* 555 F.2d 1251 (5th Cir. 1977). The Court finds no evidence that the reasons articulated for the challenged actions were pretextual.

11. A cause of action under 42 U.S.C. § 1981 is substantively congruent to a disparate treatment case under Title VII. *Crawford v. Western Electric Company, Inc., supra,* at 1315 n.27; *Scott v. University of Delaware,* 601 F.2d 76, 79–80 n.2 (3rd Cir. 1979); *Blum v. Gulf Oil Company,* 597 F.2d 936, 938 (5th Cir. 1979). Section 1981 affords no greater substantive protection than Title VII. *New York City Transit Authority v. Beazer,* 440 U.S. 568, 583–84 n.24, 99 S.Ct. 1355, 1364–65 n.24, 59 L.Ed.2d 587 (1979). In order to establish a violation under Section 1981, a plaintiff must prove by a preponderance of the evidence that the defendant acted toward him with an unlawfully discriminatory purpose. *Crawford v. Western Electric Company, Inc., supra; Williams v. DeKalb County,* 582 F.2d 2 (5th Cir. 1979), *modifying,* 577 F.2d 248 (5th Cir. 1978). "No burden shifts to the defendant until and unless the plaintiff makes a showing of purposeful discrimination." *Grigsby v. North Mississippi Medical Center, Inc.,* 586 F.2d 457, 461 (5th Cir. 1978).

12. As to both his failure to promote and his discharge claim, the Court concludes that plaintiff failed to prove by a

---

**22.** In determining whether the reason for discharge given by the defendant-employer is pretextual, courts frequently look to other factors that might sustain the plaintiff's claim that he was discharged discriminatorily. One of the factors often considered is whether the plaintiff was afforded a hearing or the benefit of an investigation prior to termination. *See, e. g., Turner v. Texas Instruments,* 555 F.2d 1251, 1254 (5th Cir. 1977); *Martin v. Chrysler Corp.,* 10 FEP 329, 332 (E.D.Mich.1974); *Goodloe v. Martin Marietta Corp.,* 7 FEP 964, 966 (D.Colo. 1972), *aff'd mem.,* 10 FEP 1176 (10th Cir. 1974). In the instant case, prior to the decision to terminate the plaintiff, the incident was investigated and reviewed by Dale Harper, Manager of Houston Stations Department. Also, Mr. Harper met with plaintiff to afford him an opportunity to give his version of the July 26 incident. Subsequently, Mr. Harper's recommendation to terminate plaintiff, plaintiff's written account of the incident, and plaintiff's entire personnel file were sent to defendant's home office in Atlanta where the incident was reviewed by individuals at several levels of defendant's personnel division. Refer to Findings 17, 18.

Also, other courts have looked to whether the employer deviated from its normal patterns and practices in effecting a complainant's termination. *See Lowry v. Whitaker Cable Corp.,* 348 F.Supp. 202, 210 (W.D.Mo.1972), *aff'd per curiam,* 472 F.2d 1210 (8th Cir. 1973). In the instant case, no evidence was introduced to show that defendant's employees followed anything other than standard operating procedure in making the decision and effecting the termination of the plaintiff. Refer to Findings 17, 18.

preponderance of the evidence that defendant's actions were motivated by an unlawfully discriminatory purpose. Refer to Findings 5–7, 16–18. *See Williams v. De-Kalb County, supra.*

### 2. Class Claims

13. With respect to liability under Title VII, the class consists only of the employees or former employees who could have filed valid charges of discrimination with the EEOC at the time the class representative, Ronald Brown, filed his charge. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3rd Cir. 1975). Plaintiff filed his first charge on January 26, 1976, refer to Finding 11; accordingly, liability under Title VII may be predicated only on actions by defendant on or after July 30, 1975, *i. e.*, 180 days prior to the date plaintiff's EEOC charge was filed. *See Crawford v. Western Electric Co., supra.*

14. Under Section 1981, the federal courts borrow the relevant state statute of limitations. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975); *Page v. United States Industries*, 556 F.2d 346, 351 (5th Cir. 1977). The applicable Texas statute of limitations for claims under Section 1981 is two years. *Dupree v. Hutchins Bros.*, 521 F.2d 236, 237–38 (5th Cir. 1975); *Prophet v. Armco Steel, Inc.*, 575 F.2d 579, 580 (5th Cir. 1978). Since plaintiff's complaint based on Section 1981 claims was filed with this Court on November 30, 1976, liability under Section 1981 extends only to actions by defendant on or after November 30, 1974.

15. Plaintiff's claims of class-wide discrimination are based on the theory that defendant's personnel policies, albeit facially neutral, have a disparate impact on members of the protected class. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Thus, proof of discriminatory motive is not required under Title VII.[23] *Davis v. Board of School Commissioners of Mobile County*, 600 F.2d 470 (5th Cir. 1979); *Fisher v. Proctor and Gamble Mfg. Co.*, 613 F.2d 527 (5th Cir. 1980).

As in the disparate treatment context, plaintiff whose claims are based on disparate impact has the threshold burden of establishing a *prima facie* violation. In order to do so, the plaintiff must prove that the challenged policies did, in fact, have a substantially disproportionate impact upon the protected class. *Moore v. Southwestern Bell Telephone Co.*, 593 F.2d 607 (5th Cir. 1979), *citing Washington v. Davis*, 426 U.S. 229, 247, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976). Unless plaintiff satisfies this initial burden, the challenged practices will not be scrutinized further regardless of their arguably unreasonable or arbitrary nature. *Moore v. Southwestern Bell Telephone Co., supra*, at 608.

16. Since the passage of the Civil Rights Act, courts have often relied on statistical evidence as proof of a violation. Indeed "[i]n many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340 n.20, 97 S.Ct. 1843, 1856 n.20, 52 L.Ed.2d 396 (1977) (citations omitted); *Fisher v. Proctor & Gamble Manufacturing Co., supra*. Statistics have considerable probative force because "absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which the employees are hired." *Hazelwood School District v. United States*, 433 U.S. 299, 307, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) *quoting Interna-*

---

**23.** As explained by the Supreme Court, claims of disparate impact:

> involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.... proof of discriminatory motive, we have held, is not required under a disparate impact theory.

*Teamsters v. United States*, 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977).

*tional Brotherhood of Teamsters v. United States, supra.* *See also Castaneda v. Partida,* 430 U.S. 482, 496–97 n.17, 97 S.Ct. 1272, 1281 n.17, 51 L.Ed.2d 498 (1977); *Falcon v. General Telephone Company of The Southwest,* No. 78–3587 (5th Cir. September 22, 1980); *Swint v. Pullman-Standard,* 624 F.2d 525, 529 (5th Cir. 1980). Thus, the Supreme Court has held that strong statistical proof may be sufficient to establish a *prima facie* case in employment discrimination cases. *See Hazelwood School District v. United States, supra; Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). *See also Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419 (5th Cir. 1980); *Fisher v. Proctor & Gamble Manufacturing Co., supra,* at 544; *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 225 & n.34 (5th Cir. 1974). However, the plaintiff does not have to prove a racially disproportionate impact with " 'complete mathematical certainty.' " *Johnson v. Uncle Ben's, Inc., supra; James v. Stockholm Valves & Fittings Co.,* 559 F.2d 310, 337 (5th Cir. 1977) *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).

While the Supreme Court has not "ruled definitely on just what threshold mathematical showing of variance along racial lines suffices as a 'substantial disproportionate impact,' " *Hazelwood School District v. United States, supra,* two approaches frequently have been employed: tests of "statistical significance" and the "80 percent rule".

Briefly stated, the first approach refers to concepts developed in the field of statistics wherein the goal is to determine whether any differences in success between racial groups of employees exists, and if so, whether the differences are of a statistically significant magnitude. In *Castaneda v. Partida, supra,* the Court recognized that the hypothesis that race plays no role is "suspect" when the difference between the observed number of decisions favoring minorities and the expected number of decisions favoring minorities exceeds "two or three standard deviations." *Id.* at 496–497 n.17, 97 S.Ct. at 1281 n.17. *See also Hazelwood School District v. United States, supra,* at 308–09 n.14, 97 S.Ct. at 2741–42 n.14.

The "80 percent rule," adopted by the EEOC and incorporated in the Uniform Guidelines on Employee Selection Procedures, 42 Fed.Reg. 65542 (1977), as corrected in 43 Fed.Reg. 1506 (1978), is a somewhat easier concept to apply. Under the rule, a claim that Blacks are promoted in insufficient numbers would fail if the selection rate for Blacks, the ratio of the number of Blacks promoted to the number of Blacks in the relevant pool, exceeds 80 percent of the selection rate for Whites in the same pool. Although the Fifth Circuit has not ruled on the propriety of the rule's use in employment discrimination cases, it has recognized its use. *Moore v. Southwestern Bell Telephone Co., supra.*

17. The Court has reviewed all of the statistical evidence and the evaluation theories submitted by both parties. Although both the "statistical significance" test and the "80 percent rule" have been used in employment discrimination litigation, the Court concludes that the preferable approach in the instant cause is a common sense evaluation of the facts of the case. Accordingly, the Court recognizes that a *prima facie* case of disparate impact may be established "by statistical evidence showing that an employment practice has the effect of denying members of one race equal access to employment opportunities." *New York City Transit Authority v. Beazer, supra.*

18. Once a *prima facie* case of disparate impact has been proven, an employer may seek to rebut it in one of two ways. First, defendant may eliminate inferences of discrimination through the use of "more refined, accurate and valid statistics." *Movement for Equal Opportunity and Equality, Inc. v. General Motors Corp.,* 22 EPD ¶ 30,863, 22 FEP Cases 1010 (7th Cir. 1980), citing *Furnco Construction Corp. v. Waters, supra,* and *Teamsters v. United States, supra.* That is, the employer may rebut the *prima facie* inferences by convincing the Court that more competent evidence establishes that the protected class has not suffered a disparate impact after all.

The second means of rebuttal would be to prove that the challenged practices have "a manifest relationship to the employment in question." *Dothard v. Rawlinson*, 443 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977) citing *Griggs v. Duke Power Co., supra.* The rationale of this defense is that even if minorities *do* in fact suffer a disparate impact, a legitimate justification exists for the disparity. The contours of this defense are not clear, but the Supreme Court recently has indicated that the issue is really "job relatedness", which turns upon whether "legitimate employment goals of safety and efficiency . . . [are] . . . significantly served by—even if they do not require [the practice in question]." *New York City Transit Authority v. Beazer, supra,* 440 U.S. at 587 n.31, 99 S.Ct. at 1366 n.31.

■ 19. Plaintiff claims that a disproportionate number of Blacks who are hired initially are assigned to inferior positions. The Court, however, concludes that plaintiff has failed to establish a *prima facie* case that defendant's initial assignment policies had a discriminatory effect on black employees during the relevant time period, either under a theory of discriminatory treatment or one of disparate impact. Refer to Findings 21–24, 33, 34. Rather, the Court concludes that defendant conclusively has established that defendant's initial assignment policy does not have a discriminatory effect upon black employees. The credible evidence proves that practically all of the employees hired during the relevant period were assigned to temporary positions, that a greater portion of those Blacks hired eventually moved into a permanent position (CSSA), and that black employees moved more rapidly into permanent positions than white employees. Refer to Findings 21–24, 33, 34.

20. As set forth more fully herein, the principal thrust of plaintiff's case is that Blacks are promoted in insufficient numbers and must wait longer for promotions than white employees. Central to plaintiff's complaints regarding defendant's promotional policies is the importance of the supervisor's evaluation and recommendation of an employee which plaintiff insists is fraught with the abuses attendant to any system based on subjective evaluations.

In *Wade v. Mississippi Cooperative Extension Service*, 528 F.2d 508 (5th Cir. 1976), the Court criticized three aspects of the defendant's employee evaluation form:

(1) the questions on the evaluation form were in large part subjective and vulnerable to either conscious or unconscious discrimination by the evaluating supervisors. *Cf. United States v. Texas Education Agency*, 459 F.2d 600, 606 (5th Cir. 1972); *see also Crawford v. Western Electric, supra,* at 1315.

(2) the evaluation scores themselves were not consistently used as a basis for . . . promotion . . . and,

(3) the defendants wholly failed to make a showing that the test was substantially related to the particular jobs of the individuals being evaluated.

*Id.* at 518. *See also Johnson v. Uncle Ben's, Inc., supra.* Further, in *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972), the Court of Appeals analyzed a promotional system and found several conditions reflecting Title VII violations:

(1) [t]he foreman's recommendation is the indispensable single most important factor in the promotion process, [but he is] given no written instructions pertaining to the qualifications necessary for promotion;

(2) standards which were determined to be controlling are vague and subjective;

(3) [h]ourly employees are not notified of promotion opportunities nor are they notified of the qualifications necessary to get jobs; and,

(4) there are no safeguards in the procedure designed to avert discriminatory practices.

*Id.* at 358–59.

■ 21. The Court concludes that the evaluation system utilized by defendant avoids the pitfalls of *Wade* and *Rowe* in the following respects: first, the categories on the evaluation form are specific and suffi-

ciently susceptible of objective determination to escape defect, *Adams v. Reed*, 567 F.2d 1283, 1286 (5th Cir. 1978); second, the evaluating supervisor is given detailed instructions on how to complete the evaluation form and conduct a subsequent interview with the subject employee. Further, the evaluator is directed to specific questions in order to appraise an employee's performance in a specific area. Refer to Findings 4, 7. Thus, although the supervisor's evaluation plays a significant role in an employee's promotion, the supervisor is given numerous, specific guidelines to be used in evaluating an employee. Refer to Findings 4, 7.

22. Further, the evaluation process contains several safeguards designed to avert discriminatory practices. First, the evaluations are reviewed by higher levels of management and by the personnel division. Refer to Findings 4, 7, 13. Second, the employee himself is afforded an opportunity to review and discuss the supervisor's evaluation and to add his own comments. Thus, an employee is apprised of his own strengths and weaknesses as well as the standards by which he will be judged for promotion. Finally, the supervisor's evaluation is not the single determinative factor in promotion; the stations manager and the personnel department in defendant's Atlanta office participate in the decision. Refer to Findings 4, 7, 10, 26, 27.

In addition, defendant has demonstrated through its evidence the relevance of the evaluation in determining an employee's eligibility for promotion. First, an employee's ability to perform the functions of one job in a department bears heavily on his fitness to advance to a more responsible position, as well as his ability to train and supervise others in his former position. Further, factors such as dependability, relationships with others and supervisory ability are, by definition, pertinent to an employee's ability to perform as a supervisor or assistant supervisor. Also, the evidence clearly demonstrated that current employee evaluations are, in fact, utilized in selecting employees for promotion. Refer to Findings 4, 7, 10, 26, 27.

23. Finally, in accordance with its promotion-from-within policy, all vacancies throughout defendant are posted in all defendant's branch offices. Refer to Findings 8, 27. Accordingly, the Court concludes that defendant's system of evaluating employees avoids the hazards proscribed by *Wade* and *Rowe*.

24. Subjective evaluation procedures such as those utilized by defendant are not *per se* violative of Title VII; in order to fall within those practices proscribed by the Act, such procedures must result in discrimination against the protected class. *Hester v. Southern Railway Co.*, 497 F.2d 1374, 1381 (5th Cir. 1974). Thus, courts must look beyond the form of the practice and the employer's motivation to the consequences of the procedures. *Griggs v. Duke Power Co., supra; Rowe v. General Motors, supra.*

25. With regard to the plaintiff class' promotion claims, the Court concludes that plaintiff has failed to establish a *prima facie* case that defendant's promotional policies had a discriminatory effect on black employees during the relevant time period, either under a theory of discriminatory treatment or one of disparate impact. Refer to Findings 25, 28–34. Instead, the Court concludes that defendant conclusively has established that its promotional policies did not have a discriminatory effect on black employees. The Court concludes that Blacks are promoted at a rate comparable to that which one would expect from the black representation in the various pools.[24] Refer to Findings 25, 28–34.

---

24. That Blacks occupy a greater proportion of positions in the middle and lower levels of Delta's employment pyramid in its Houston Stations Department is not due to any disparate pattern of promotion activity during the liability period. Instead, it is traceable to the fact that the rate of turnover during the liability

period has not been large enough to permit the "percolation" of many minorities into the supervisory positions. Refer to Findings 21–24, 33, 34. *See Lee v. City of Richmond*, 456 F.Supp. 756 (E.D.Va.1978). Plaintiff has not made out a *prima facie* case by showing that the upper level positions in defendant's em-

26. In the event that any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such. In the event that any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

Defendant is hereby directed to submit a Final Judgment incorporating by reference the foregoing Findings of Fact and Conclusions of Law within ten (10) days hereafter.

ployment pyramid do not approximate the racial makeup of the Houston Stations Department as a whole. *See Swint v. Pullman-Standard*, 539 F.2d 77, 94 n.40 (5th Cir. 1976). Title VII does not require a racially balanced work force. *Lewis v. Tobacco Workers International Union*, 577 F.2d 1135 (4th Cir. 1978), and the fact that Whites outnumber Blacks in upper level classifications and Blacks outnumber Whites in lower level classifications does not in itself indicate racial discrimination. *Lee v. City of Richmond, supra*, at 770.