Eileen WOLFE

v.

The BALTIMORE AND OHIO RAILROAD COMPANY and United
Transportation Union.

Civ. No. HM83–4115.

United States District Court,
D. Maryland.

March 29, 1985.

Sheldon H. Laskin, Rupli, Vekert & Laskin, Ellicott City, Md., for plaintiff.

H. Russell Smouse, M. Melinda Thompson, Melnicove, Kaufman, Weiner & Smouse, Baltimore, Md., for defendants.

## MEMORANDUM

HERBERT F. MURRAY, District Judge.

Plaintiff Eileen Wolfe brings the instant action pursuant to 42 U.S.C. § 2000e *et seq.*, claiming that defendant Baltimore and Ohio Railroad Company unlawfully and discriminatorily denied her promotion to the position of locomotive engineer on the basis of sex. Plaintiff also alleges that defendant discriminated against her in training, terms and conditions of employment on the basis of sex. Defendant Baltimore and Ohio Railroad Company ["B & O"] claims, in response, that defendant's refusal to promote plaintiff to the position of locomotive engineer is not attributable to any discriminatory animus on defendant's part. Defendant contends, instead, that pursuant to the mediation agreement between defendant and plaintiff's union, plaintiff was not qualified to be promoted to engineer because of her failure to pass the Oral Operating Rules Examination on her second attempt. The court held a non-jury trial on this matter beginning on February 13, 1985 and concluding on March 11, 1985. Counsel have submitted to the court Proposed Findings of Fact and Conclusions of Law. The court has reviewed counsel's proposals as well as all memoranda submitted to date and notes of testimony given in the case at bar and has determined to adopt defendant's Proposed Findings of Fact and Conclusions of Law with few exceptions. The court's ruling is thus set forth below adopting defendant's Proposed Findings of Fact and Conclusions of Law and incorporating plaintiff's Proposed Findings of Fact and Conclusions of Law where appropriate.

## FINDINGS OF FACT

1. The female plaintiff, Eileen Regina Wolfe, is currently a resident of Newark, Delaware. (Plaintiff's testimony).

2. Defendant, B & O, is an employer within the meaning of 42 U.S.C. § 2000e *et seq.* (Defendant's Admissions; *See also* Plaintiff's Proposed Findings of Fact, No. 1 at p. 1).

3. Plaintiff Wolfe was initially hired by the B & O onto the Maryland Division, Baltimore West End Subdivision on or about March 8, 1979 as a laborer/oiler. Plaintiff worked at the coal pier until May 23, 1979, at which time she was accepted into the B & O engineer training program and was placed on the firemen's seniority roster.[1] The plaintiff's transfer into engine service from her laborer's position came as a result of her original application for employment with the B & O for the position of fireman. Some openings became available in the engineer training program and Ms. Wolfe qualified for acceptance into the program. (Plaintiff's and Kirk's testimony). (*See also* Plaintiff's Proposed Findings of Fact, No. 8 at p. 2). Ms. Wolfe first met her eventual supervisor, General Road Foreman of Engines S.T. Kirk, at the B & O personnel office when she applied to transfer into engine service. At that time Mr. Kirk explained the engineer training program to a group of prospective trainees and advised them of job conditions, salary and other information relating to engine service employees. (Testimony of S.T. Kirk).

Once Ms. Wolfe was accepted into the engineer training program and put on the firemen's seniority roster, she worked as a hostler in the Riverside Yard in Baltimore and also in the Brunswick Yard. As a hostler, she learned to operate all types of engines and operated engines in the yards for eight (8) hours a day. On June 1, 1979, plaintiff took a written test administered by Road Foreman of Engines, J.C. Rayner, which she passed. Passing this initial test allowed plaintiff to work as a promoted hostler. Plaintiff was treated fairly both during her three (3) months as an oiler-laborer at the coal pier, and at the time she was a hostler prior to entering into Phase I of the engineer training program. (Plaintiff's testimony).

4. Beginning in November 1979, plaintiff attended the Engineers' Training School in Cumberland, Maryland for five (5) weeks of classroom instruction, which was known as Phase I of the engineer training program. In all, there were ten (10) students in the training school at the time of Ms. Wolfe's attendance, four (4) of whom were from the Baltimore West End. Plaintiff was the only woman at the engineer training school at that time. The engineer training school program consisted of classroom instruction from approximately 8:00 a.m. until 4:00 p.m. every day. Each day there was a one-hour quiz in the morning, which was an essay test covering the material that the students had learned the day before. The quizzes were graded on a basis of "P", "F", or "G". (Poor, Fair or Good). If a trainee received four "Poors" or more, the trainee received a "Poor" as a final grade from the engineer training school in Cumberland. It was, however, impossible to fail out of the program at the end of Phase I. The plaintiff completed Phase I with a grade of "P", having earned six "Poors" on daily quizzes. (Plaintiff's testimony and testimony of S.T. Kirk). (*See also* Plaintiff's Proposed Findings of Fact, Nos. 9, 10, at p. 2).

5. After completing the training school portion of the training program, plaintiff began Phase II, which lasted approximately four and one-half (4½) months. During Phase II, plaintiff and the other trainees in her class were assigned to ride with experienced engineers in order for the trainees to gain practical experience in operating locomotives and to become familiar with the

---

**1.** Plaintiff notes that as of January 1, 1980, 214 individuals were listed on the West End Division—Baltimore Firemen's Seniority roster, four of whom were female. Of the four females, two had qualified as Locomotive Engineers. (*See* Plaintiff Proposed Findings of Fact, No. 11 at p. 2).

territory over which they would have to operate when and if they became promoted engineers. The General Road Foreman of Engines also routinely held biweekly conferences on rules which trainees were required to attend. For Ms Wolfe's class Mr. Kirk held two extra conferences during the first month to give her class extra help.

Plaintiff was assigned to various engineers to train her, including Mr. Joe Breeden, H.D. Gaither, a Mr. Patterson, and Mr. C. Rohlfing. Although plaintiff did not have any complaints about Mr. Breeden or Mr. Patterson as training engineers, plaintiff requested after approximately two round trips with Mr. Gaither to be removed from his turn because he did not want to teach her. (Plaintiff's testimony). Mr. Kirk told plaintiff that she could learn from Mr. Gaither and that she should ask him questions to show him that she wanted to learn. Mr. Kirk did not immediately transfer her from Mr. Gaither because Mr. Gaither was a competent engineer, and one of only two engineers regularly assigned to the Brunswick-Potomac Yard run, which provided necessary exposure to approximately fifty per cent (50%) of the territory over which an engineer in the Baltimore West End would have to operate.

Plaintiff was eventually reassigned from Mr. Gaither to Mr. Patterson, and then to Mr. Rohlfing. After six or seven weeks, Mr. Rohlfing allegedly said to plaintiff that he had told Mr. Kirk that he did not "babify" people on his run. During her time with Mr. Rohlfing, plaintiff asked to be transferred to another engineer. Although at one point Road Foreman James Rayner agreed to transfer plaintiff, he was countermanded by Mr. Kirk and plaintiff remained with Mr. Rohlfing until the end of her Phase II training, approximately ten weeks. (Plaintiff's testimony).

Mr. Kirk testified that he assigned Ms. Wolfe to Mr. Rohlfing because he knew that Mr. Rohlfing let the students run the trains, he was patient and never in a hurry, and he knew and understood the rules. Mr. Kirk thought that Mr. Rohlfing was the best person to train Ms. Wolfe. Ms. Wolfe asked to be reassigned claiming that Mr. Rohlfing fought with his brakeman; she denied to Mr. Kirk that she had a personality conflict with Mr. Rohlfing. Mr. Kirk told her that it was not unusual for an engineer to have conflicts with the brakemen and that she should go back to her training position. Plaintiff also complained about Mr. Rohlfing saying that he used the dynamic brake most of the time and that he would not teach her how to use the automatic brake. Mr. Kirk testified that dynamic braking was required at that time for fuel conservation and that on the coal trains which the plaintiff operated with Mr. Rohlfing from Brunswick to Cumberland, Maryland, Ms. Wolfe would necessarily have had to use the air brake (automatic brake) in conjunction with the dynamic brake.

6. Defendant had a policy of evaluating its trainees at the end of Phase II by administering several final tests to determine whether a trainee could be promoted to engineer. The examinations consisted of four (4) tests: Operating Rules Questionnaire, a written open-book test on which a passing score was 95%; a Locomotive Operation Train Handling test, which was a written, multiple-choice, closed-book examination on which a passing score was 75%; an Oral Operating Rules Examination (OORE) on which a passing score was 85%; and a Road Qualifying Trip, which was graded on a pass-fail basis. Pursuant to the Mediation Agreement between the defendant and the United Transportation Union (UTU) [2] plaintiff's union, a trainee was

---

**2.** For all times pertinent hereto, defendant United Transportation Union represented all Trainmen and Firemen employed by the defendant B & O, including the plaintiff herein. Defendant UTU was and is a party to Mediation Agreement, Case No. A–9152, July 19, 1972, governing the training program for Locomotive Engineers (Plaintiff's Exhibits 3–A and 3–B).

Plaintiff asserts no claim for relief against defendant UTU. The UTU was joined as a party-defendant in this action solely for the purpose of according complete relief. F.R.Civ.P. 19. (Plaintiff's Proposed Additional Finding of Fact and Conclusions of Law, I, II at p. 1).

entitled to take a final examination a second time if the trainee failed the first attempt. Failure of any one of the final tests a second time resulted in termination of employment from the B & O. (Plaintiff's Exhibit 3). (*See also* Plaintiff's Proposed Findings of Fact, No. 12 at p. 3).

7. Trainees were made aware during Phase II that they would have to take the Road Qualifying Trip at some time toward the end of their Phase II training. Plaintiff's Road Qualifying Trip was administered and graded by Road Foreman of Engines, James C. Rayner, in May of 1980. Mr. Rayner met the plaintiff at Riverside, where they boarded the train to Brunswick. At the beginning of the trip, plaintiff complained that the engine on the front of the train was a socalled GP–9 or a "long-nosed" engine. Plaintiff indicated to Mr. Rayner at that time that she had never been trained on a GP–9. Plaintiff did testify, however, that she had operated GP–9s as a hostler and Mr. Kirk testified that she would have been trained on GP–9s at the training school. Two other engines and a train were eventually added to the consist at Curtis Bay. The two engines placed behind the GP–9 were of the more modern type "short-nosed" engines. She asked Mr. Rayner if the consist could be arranged so that one of the short-nosed engines would be first. Mr. Rayner asked plaintiff if she could take the train to Brunswick with the GP–9 on the front. Plaintiff indicated that she could and she took her Road Qualifying Test on the GP–9. (Plaintiff's testimony and Rayner's testimony).

Mr. Kirk testified that the controls and operation of the GP–9 and the newer locomotives are essentially the same although the brake handle on the 24 RL, which is on the GP–9 locomotive, is somewhat different from the handle of the 26L, or the newer model brake. On the GP–9 the view from the engine is somewhat different from the view from the newer model engines because on the GP–9 the nose of the engine is longer in front of the engineer's cabin.

8. Engines are assigned to trains by the Motive Power Bureau. Neither the General Road Foreman of Engines nor the Road Foreman of Engines conducting the Qualifying Test has a choice in the engine assigned to the train on which the qualifying test is given, nor do they have any preknowledge of what engine will be assigned. (Testimony of S.T. Kirk and J.C. Rayner). Approximately forty per cent (40%) of the B & O fleet at the time of plaintiff's Road Qualifying Test was of the long-nosed type locomotive. The short-nosed locomotives could also be operated backwards, *i.e.*, with the long portion forward. (Kirk's testimony).

Plaintiff's Qualifying Test was a run approximately one hundred (100) miles long, taking nine (9) hours. (Plaintiff's testimony). In the engine, the trainee sat at the engineer's seat on the right of the engine and the Road Foreman and the engineer of the train sat on the two seats to the left of the engine, normally the "fireman's side." (Plaintiff's testimony and testimony of Josselyn and Rayner). It is the practice on the railroad that whoever first sees signals will call them. Although plaintiff testified that Mr. Rayner did not observe her during the trip and that no one called signals, both Mr. Rayner and the engineer, Mr. R. Josselyn, testified that they both sat on the left facing forward and called any signals that were necessary to call from the left of the train. (Josselyn and Rayner testimony). Mr. Rayner during the Qualifying Test, instructed Mr. Josselyn not to give advice to the trainee. The plaintiff wanted to look in her timetable and her train handling book during the test. Mr. Rayner informed the plaintiff at that time that she was not to refer to the timetable or the train handling book during the test. Furthermore, Mr. Rayner told the engineer not to answer any questions of the trainee during her test. (Josselyn and Rayner testimony).

The plaintiff was informed that she had failed to pass the Road Qualifying Test and that she would have another opportunity to pass the test. (Kirk testimony). Mr. Rayner testified that Ms. Wolfe did not pass the qualifying trip because she did not

know where she was at various locations on the railroad; she used the brake going uphill; she used the throttle going downhill; and in an area where the maximum speed was 55 miles per hour, she ran the train under 20 miles per hour. Mr. Josselyn confirmed that plaintiff's use of the dynamic brake going uphill was unusual. Plaintiff's failure of the first Road Qualifying Test, however, did not result in her termination from employment with the B & O. (Stipulation). (*See also* Plaintiff's Proposed Findings of Fact, No. 18 at pp. 4–5).

9. The OORE was administered to plaintiff and to four (4) males in her training class for the first time on May 13, 1980. Although the OORE was generally administered by the Rules Examiner of the Baltimore West End Subdivision, James Musick, at the time it was necessary to administer the OORE to plaintiff's class, Mr. Musick was assigned to other duties in Gaithersburg, Maryland, and was unavailable to administer the OORE. (Kirk testimony). The OORE was administered to plaintiff's class by Mr. Kirk, assisted by Road Foreman of Engines Stephen Holler. Mr. Kirk had been a Road Foreman of Engines since 1970, had been a full-time instructor at the training school in Cumberland from 1975 through 1977 and had been a General Road Foreman of Engines since February 1977. As such, Mr. Kirk had administered between three and four hundred Oral Operating Rules Examinations prior to administering the test to plaintiff's class. He is currently chairman of the Rules Committee of the B & O and serves as its representative to the Rules Committee of the B & O and serves as its representative to the Rules Committee of the Association of American Railroads. (Kirk testimony).

The OORE as administered to plaintiff's class by Mr. Kirk, was essentially the same test that had been administered on the B & O to Mr. Kirk twenty-one (21) years before, to Mr. Holler two (2) years before, and by Mr. Holler, Mr. Musick and others since the examination administered to plaintiff's class. (Kirk and Holler testimony). The OORE consisted of three (3) sections: (1) knowledge of signals, in which a mechani-

cal device known as a signal box was used to simulate signals; (2) knowledge of operating rules in the territory in which the trainee will be required to operate; and (3) knowledge of general operating rules in effect. The test was administered to all trainees in the same fashion. For the first two portions of the test the trainees were taken into a room with the administrator and his assistant individually. Each trainee was asked to identify the signals as they were flashed on the mechanical device and they were asked to demonstrate their knowledge of the rules in effect on the territory. On the third section of the examination, all trainees were brought into the room together and were asked questions on their general knowledge of the rules in effect. The questions asked were of equal difficulty to each trainee and each trainee was given ample opportunity to respond either initially to questions or to agree or disagree with another trainee's response to a question. (Kirk, Holler, Plaintiff and Michael Wolfe testimony). During the test, Mr. Kirk and Mr. Holler independently kept written notes as to whether each of the trainees had responded correctly or incorrectly to each question. There was no written record of the actual questions asked and the actual answers given. After the test was administered, Mr. Kirk and Mr. Holler compared their notes as to the scores for each of the trainees. Their scores for each of the trainees were very close. All of the Baltimore West End trainees did poorly on the first test and plaintiff was the weakest. At the first test in May 1980, plaintiff and three of the males taking the test failed the test. One trainee, a Western Maryland man, passed the test at that time. (Kirk, Holler and Michael Wolfe testimony). (*See also* Plaintiff's Proposed Findings of Fact, Nos. 13, 14, 15 (last sentence stricken) at pp. 3–4).

10. The trainees who failed the OORE or the Road Qualifying Test for the first time were given an opportunity to retake the examination. In order to prepare for the retests on the train handling test and

the OORE, trainees were provided opportunities to increase their knowledge. Although all trainees at the time of failing the first OORE were required to return to their regular service as hostlers' firemen, any trainee who failed the OORE the first time could attend the regularly scheduled bi-weekly conferences and was encouraged to do so. In addition, Ms. Wolfe was provided the opportunity to ride with any engineers of her choosing on her time off in order to prepare for her second Road Qualifying Test. (Plaintiff's testimony and Kirk and Holler testimony). In addition, the B & O officers made themselves available for consultation on the rules. (Kirk and Holler testimony). The plaintiff attended only one of the biweekly conferences and testified that she found attendance at that conference helpful. The plaintiff admitted that she never consulted Messrs. Kirk, Holler or any other supervisory employee of the defendant for any instruction or assistance on the rules.[3]

11. On July 29, 1980, a second OORE was administered to Ms. Wolfe and two of the three males who had failed in Ms. Wolfe's class. The other trainee, Mr. Butterhof, was on vacation at that time, and did not take the test with the group the second time. (Plaintiff's testimony and Kirk and Holler testimony). As is company policy, the same people who administered the first test administered the second OORE. (Kirk testimony). The test was administered in the same manner as the first, covered the same material, with the same sections and the same manner of grading. Mr. Kirk indicated that Ms. Wolfe did not understand Rule 93, which involved train movements within yard limits, and that she was deficient on recognizing signal indications, particularly improp-

erly displayed signals. He testified that in the application of the rules she had difficulty in associating the rules with practicality. Mr. Holler testified that Ms. Wolfe did poorly on all sections of the test. Although a passing score on the OORE was 85%, Ms. Wolfe received a 67% on the second examination. As a result of her failure to pass the second OORE, and pursuant to the Union Contract, Ms. Wolfe was terminated from employment with the B & O on July 29, 1980. (Kirk and Holler testimony) (*See also* Plaintiff's Proposed Findings of Fact, Nos. 16, 17 at p. 4).

12. Both on May 12, 1980 and May 14, 1980, the general chairman of plaintiff's union was copied on a letter to Ms. Wolfe informing her of her failure to pass the Road Qualifying Test and the OORE. (Kirk testimony and stipulation).

13. Another trainee, a Mr. Robert Usher, who was promoted to engineer in 1980, testified that he was also placed with engineer Rohlfing during his training period. Mr. Usher spent approximately seven (7) weeks with Mr. Rohlfing before he requested a change to another engineer, stating that he did not like working with Mr. Rohlfing and had learned as much as he could from him. Mr. Usher was changed to another training engineer.

14. There have been in the Maryland Division of the B & O approximately fifteen to sixteen females out of a total of one hundred seventy engineers since 1977. On the Baltimore West End Subdivision there have been approximately five to seven females during the same time. No other female has failed to pass the Road Qualifying Test or the OORE. (Kirk testimony).

15. Mr. Josselyn, an engineer who testified on behalf of plaintiff, testified that he

---

**3.** As Ms. Wolfe was the only member of her class who had been failed on both the Road Qualifying Test, and the initial Oral Operating Rules Test, Ms. Wolfe was the only member of her class who had to do three tasks simultaneously: requalify for the Road Qualifying Test within ninety days, requalify for the Oral Operating Rules Test within ninety days, and work her full-time job. The males who failed the Oral Operating Rules Test only had to requalify

on the Oral Operating Rules Test, and work their full-time job. Ms. Wolfe was directed by Mr. Kirk to requalify on the Road Qualifying Test by riding with qualified engineers on her own time. By necessity, this meant she had to go out on trains when there were trains with qualified engineers available to ride with her. She devoted 169 hours of uncompensated time to this task. (Plaintiff's Proposed Findings of Fact, No. 26 at pp. 7–8).

had observed two other Road Qualifying Tests given to male engineers by Road Foremen other than Mr. Rayner. He did not observe whether they were allowed to consult the timetable during their road qualifying examinations. The two trainees which he observed did not have GP–9 engines for their tests.

16. Another engineer who testified on behalf of plaintiff, Mr. Merle Miller, testified that he had observed one student take a Road Qualifying Test graded by Mr. Holler. He testified that Mr. Holler indicated no objection to the trainee's having the timetable available. On cross-examination Mr. Miller said that he did not recall that the trainee attempted to use the timetable.

17. After plaintiff was terminated from the B & O as a fireman, she was rehired in September 1980 as a brakeman on the B & O. In December 1980 plaintiff began working as a flagman on the Baltimore West End Subdivision. On January 26, 1983, plaintiff was promoted to yardmaster on the Philadelphia Subdivision. In November 1983, plaintiff qualified as a flagman on the Philadelphia Subdivision. Plaintiff is still working for the B & O as a yardmaster, but has been absent from work due to headaches since September 1984. Her daily rate as a yardmaster is $123.24. (Plaintiff's testimony).

18. Plaintiff sustained an injury on the job on December 12, 1981, when she was working as a brakeman; she sprained her right thumb in a fall. She was absent from work on account of the injury for approximately ten (10) months thereafter.

19. Plaintiff testified that beginning in the summer of 1983, she began being absent from work because of headaches. In the summer of 1983 she was absent on account of headaches for approximately one (1) month. Since September 1984, she has been consistently absent from work on account of headaches.

20. On January 31, 1983, plaintiff began seeing Dr. Kenneth Ellis, a psychologist who eventually advised plaintiff in the summer of 1983 that she should not return to work until her headaches were in remission. Dr. Ellis also advised plaintiff in September 1984 not to return to work because of her headaches. Dr. Ellis and Dr. Lawrence Donner, a psychologist who testified on behalf of defendant, testified that in their opinion Ms. Wolfe's headaches are attributable to her decision to proceed with this case in litigation. Ms. Wolfe did not see any other health care professional between the time that her headaches allegedly began and her first visit to Dr. Ellis in January 1983. (*See also* Plaintiff's Proposed Findings of Fact, No. 29 at p. 9).

21. Dr. Donner concluded that the plaintiff suffers from a personality disorder which makes her anticipate that others, particularly males in positions of authority, will find fault with her. Dr. Ellis confirmed that Ms. Wolfe "does not have a good idea of what the world expects of her or what she should expect of the world." He further stated that her judgment is at times not good and she tends to misinterpret the words and actions of others.

22. Plaintiff's earnings since July 29, 1980 through the end of December 1984 have been $65,128.16. Plaintiff has produced tables from defendant's records which indicate what five (5) other employees of the B & O who were immediately above or immediately below plaintiff on the fireman's seniority roster earned in that same period of time. (*See also* Plaintiff's Proposed Findings of Fact, Nos. 30, 31, 32, 33 at pp. 9–10).[4]

23. Plaintiff's personal injury claim against the railroad was settled out of court in an amount of $35,000.00. Her attorney contended that she had been unable to work because of her injury for a total of 287 days, the daily rate for plaintiff at that time being $87.00. (*See also* Plain-

---

4. The court notes that plaintiff reports that plaintiff's total wages for the period Aug. 1, 1980 through Dec. 31, 1984 were $69,923.18, while defendant reports that plaintiff's wages for such period were $65,128.16. The court, however, finds this discrepancy immaterial because the court believes that plaintiff is not entitled to damages.

tiff's Proposed Findings of Fact, No. 28 at pp. 8–9).

24. Plaintiff, believing that she was being denied a promotion by being treated in a discriminatory fashion on the basis of sex filed a Charge of Discrimination with the Equal Employment Opportunity Commission on November 20, 1980. The EEOC issued its Notice of Right to Sue on August 30, 1983. The instant lawsuit was filed on November 30, 1983. (Defendant's Admissions; *See also* Plaintiff's Proposed Findings of Fact, Nos. 2, 3, 4, 5, 6 and 7 at pp. 1–2).

## CONCLUSIONS OF LAW ON LIABILITY

■ The plaintiff alleges that defendant denied her a promotion to the position of locomotive engineer in July 1980, as a result of sex discrimination. Plaintiff's case is based on the familiar Title VII disparate treatment model. *Texas Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Page v. Bolger*, 645 F.2d 227 (4th Cir.1981), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981). In such a case, plaintiff must persuade the trier of fact that defendant intentionally discriminated against plaintiff. *TCA v. Burdine, supra.* Plaintiff initially must present a *prima facie* case, that is plaintiff must show actions taken by an employer, from which the finder of fact might infer, if such actions remain unexplained, that it is more likely than not that such actions were based on discriminatory criteria. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). If the plaintiff succeeds in presenting a *prima facie* case, the burden then shifts to the defendant to "articulate some legitimate, non-discriminatory reason for the employment decision." *Id.* at 578, 98 S.Ct. at 2950; *TCA v. Burdine, supra.* The employer need not persuade the court that these reasons actually motivated the employment decision; it is sufficient if the evidence raises a genuine issue of fact. *Id.; Peters v. Lieuallen*, 568 F.Supp. 261

(D.Ore.1983). If the defendant satisfies this requirement, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered were not defendant's true reasons, but were a pretext for sex discrimination. *TCA v. Burdine, supra.*

■ Plaintiff is apparently basing her claim of sex discrimination on both her failure to be promoted and on various incidents of the training program. *See Wright v. National Archives and Records Service*, 609 F.2d 702 (4th Cir.1979). In promotion cases based on disparate treatment, for a plaintiff to present a *prima facie* case of denial of promotion due to sex, she must prove (1) that she belongs to the protected class; (2) that she applied for and was qualified for a job for which the employer was seeking applicants; (3) that despite her qualifications, she was not promoted; and (4) that after her nonpromotion, others not in the protected class with plaintiff's general qualifications were promoted by the employer. *Id. See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Page v. Bolger, supra*, 645 F.2d at 229–30; *Brown v. Delta Airlines, Inc.*, 522 F.Supp. 1218 (S.D.Tex. 1980).

There is no dispute that plaintiff belongs to a protected class. Defendant contends, however, that she was not qualified for the position for which she applied and, thus, cannot make out the second prong of the *prima facie* case. Plaintiff asserts that her failure to pass the OORE was as a result of sex discrimination. She apparently claims that the persons who administered and graded the OORE were motivated by a sexually discriminatory animus in assigning her failing grades; that the person who administered the Road Qualifying Test was motivated by a sexually discriminatory animus; and that her unequal training was the effective cause of her lack of qualification for promotion.

■ This case differs from the conventional disparate treatment case because the very factual predicate of the *prima facie* case is what the parties dispute. The order

of proof may be different (and certainly was in the instant case) because in such cases it may be necessary for the court to determine the facts on the evidence as a whole rather than specifically ruling after the plaintiff's case whether or not she has made a *prima facie* case. *See Casillas v. United States Navy*, 735 F.2d 338 (9th Cir.1984); *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266 (9th Cir.1980); *Mosby v. Webster College*, 563 F.2d 901, 903 (8th Cir.1977). In such cases, the employer may prevail on either of two grounds: the court may find that the employer has refuted the *prima facie* case or that the employer has shown without rebuttal that the actions complained of were taken for legitimate non-discriminatory reasons. *Id.* As in every discrimination case, however, in order to prevail, plaintiff bears the burden of proving by a preponderance of the evidence that the defendant intentionally discriminated against her on the basis of sex. *Burdine, supra*, 450 U.S. at 253, 101 S.Ct. at 1093; *Wright v. National Archives, supra*, 609 F.2d at 716.

As part of her "prima facie" case, plaintiff complained of her treatment at the hands of the B & O in the following particulars: (1) that while she was at the training school in Cumberland, she was disturbed by businessmen occupying the room next door to her at the Algonquin Hotel, but was denied a room change; (2) that at the school in Cumberland, she perceived that she had been ridiculed on one occasion by one of the instructors; (3) that she was required to remain with two training engineers about whom she complained to her supervisor because they did not want to teach her or in her opinion, they did not teach her properly; (4) that on her Road Qualifying Trip, the evaluating Road Foreman of Engines, Mr. Rayner, refused to allow her to consult her timetable or her train handling book during the trip; (5) that she was required to take her Road Qualifying Trip operating an engine known as the GP–9, a locomotive which she testified was different from the locomotives on which she had been trained; (6) that the OORE was administered not by the Rules Examiner who generally administered the examination, but by her supervisor, Mr. Kirk; (7) that the specific questions and answers of the OORE which she took were not written down and retained by the B & O; and (8) that after failing the Road Qualifying Test and the first OORE, she was required to work full time and in order to prepare for the second round of tests she needed also to ride with other engineers on her days off.

Most of the acts of which plaintiff complains do not raise the necessary presumption of sex discrimination sufficient to rise to the level of even a *prima facie* case. *Wright v. National Archives, supra*, 609 F.2d at 715. Those that might raise a presumption were explained by defendant as based on legitimate nondiscriminatory reasons. Plaintiff failed on rebuttal to show that any of the complained of employment decisions was a pretext for sex discrimination.

▮ Although she complained of some incidents at the training school in Cumberland, plaintiff did not present any evidence that males were treated any differently there. In any case, no one could fail out of the training program at the end of Phase I. There is no presumption of sex discrimination raised about the incidents at the school.

Plaintiff complained that she was not changed from training engineers when she complained about them during Phase II. Mr. Kirk explained that she was not changed immediately from Mr. Gaither, an experienced and competent engineer, because Mr. Gaither was one of two engineers who was on a regular turn over a certain portion of the railroad territory which covered 50% of the territory which plaintiff was required to learn in order to be a promoted engineer. She was kept on that turn for approximately four weeks so that she could learn the territory. Mr. Kirk explained that she was not changed from Mr. Rohlfing because Mr. Kirk felt that Mr. Rohlfing was the best engineer to train plaintiff because he let engineer train-

ees run the train and he knew and understood the rules and was interested in their application. Plaintiff presented testimony from Robert Usher, a male trainee who said that when he asked for a transfer from Mr. Rohlfing because of a personality conflict, he was granted the transfer. But this trainee had remained with Engineer Rohlfing for seven weeks, and plaintiff had remained with him for ten weeks. Mr. Kirk testified that plaintiff had not indicated that she had a personality conflict with Mr. Rohlfing, which would have been a reason to transfer her, but that she merely indicated a desire to be changed because Mr. Rohlfing fought with his brakeman.

■ The testimony of how other Road Foremen of Engines may have handled the Road Qualifying Test on other occasions somewhat differently is not evidence of intentional sex discrimination. The purpose of a Road Qualifying Test is for the supervisor to determine if a trainee will be able to properly operate any train he or she might be assigned to as an engineer. There is no special Uniform Road Qualifying Test track or train for trainees to test under ideal conditions. Just as each train to which an engineer might be assigned will be somewhat different, each train on which a Road Qualifying Test is given may be somewhat different from another because the tests were given on trains already scheduled to run. The B & O has a right to expect that an engineer should be able to handle any train that comes along and that an engineer will not have to ask for a change of engine in order to take the train down the road. The plaintiff, in any event, testified that she could operate the locomotive which had been assigned by the Motive Power Bureau.

The Road Foreman who administers the test indicates to a trainee that they will meet and pick up a train that is already scheduled to run and that the Road Foreman will observe the trainee running that train. Neither the Road Foreman nor the General Road Foreman, Mr. Kirk, had power to choose what locomotive would be on the front of any particular train or even

knew ahead of time what locomotive would be assigned to a particular train. The testimony indicated that although the GP–9 was different from some of the more modern engines in that the nose of the engine was longer on the front and the controls were in a somewhat different position from the controls on the newer engines, the operation of the engines was very similar. There was also testimony that forty per cent (40%) of the B & O fleet at that time consisted of long-nosed engines.

The testimony by Mr. Rayner, who graded plaintiff on her Road Qualifying Test, corroborated in part by plaintiff's own witness, Mr. Josselyn, the engineer who rode on that test run, indicated that plaintiff failed her Road Qualifying Test because she did not know where she was geographically on the railroad at certain times, that she operated the brake on an uphill grade, used the throttle going downhill and that she ran under twenty (20) miles per hour in certain sections where the maximum speed was fifty-five (55) miles per hour. There was no testimony that she failed because she did not properly make the air brake test or that she had difficulty operating the controls because they were somewhat different from the newer engines. There was also testimony that both the engineer and the Road Foreman of Engines sat to the left on the engine and called the signals to plaintiff as they rode down the road, thus making up for any alleged difficulty in seeing out the left hand side of the locomotive.

In rebuttal, Merle Miller testified that he had observed Mr. Holler give a Road Qualifying Test to one male trainee. The trip was from Riverside to Brunswick. The trainee had told Mr. Miller that he did not want to take his test on the GP–9 engine assigned on the front of his train. Mr. Miller testified that the engines were rearranged so that a newer engine was on the front. Mr. Miller evaded answering the question put to him on cross-examination as to whether the power bureau would refuse to change an engine without some good reason given such as a malfunction of

the equipment. The defendant objected to Mr. Miller's testimony as not proper rebuttal. In fact, the testimony did not refer to Mr. Rayner's treating males differently from Ms. Wolfe, but to a different Road Foreman's making a different decision on one occasion. Mr. Miller also did not testify that the trainee had asked Road Foreman Holler to rearrange the consist for the convenience of his test, nor did Mr. Miller say that Mr. Holler allowed the rearrangement at the trainee's request for that reason.[5]

Plaintiff raised the issue that contrary to normal procedure plaintiff's OORE was administered by Mr. Kirk rather than the Rules Examiner, Mr. Musick. The testimony by B & O witnesses indicated that the reason that Mr. Musick did not administer the examination was that Mr. Musick was on a special assignment out of the area at the time during which the examination by contract had to be given. The testimony was clear that both Mr. Kirk, who administered the examination, and Mr. Holler, who assisted in administration, were qualified to administer the examination. Mr. Kirk, in fact, had previously administered between three hundred and four hundred OOREs prior to administering the examination to Ms. Wolfe's class.

There was no testimony by anyone that the OORE administered to plaintiff was administered to any other trainee in any different fashion. In fact, all of the testimony regarding the OORE administered to plaintiff and the males in her class indicated that the test was administered even-handedly and that the questions and the method of administering the examination to plaintiff and the males in her class was the

same. There was also testimony that the OORE administered on other occasions by other examiners, including the Rules Examiner, Mr. Musick, was administered in the same fashion and covered the same material as the examination given to the plaintiff.

In support of her contention that she was a victim of sex discrimination, plaintiff attempted to show that the OORE which she failed twice was subjective, that no records were kept of the questions and answers, and thus an inference was raised that defendant practiced sex discrimination in its administration. The evidence showed that although not written, the test was objective, not subjective. In plaintiff's class, several examinees took the OORE simultaneously. One portion of the test involved identifying signals displayed to the examinee. One portion of the test involved explaining the rules in effect on the portion of track over which the examinee would operate. In one portion questions were based on the Operating Rules Book. On both of plaintiff's examinations each examinee was asked approximately the same number of questions and questions of the same difficulty by the examiner.

Two B & O officers, one previously unknown to plaintiff, scored both of plaintiff's OOREs independently and each assigned a failing score to plaintiff both times. Both Mr. Kirk and Mr. Holler testified that they kept separate written records of how the trainees responded on the three sections of the examination. Although there were no records of the specific questions and specific answers given, the scorers kept contemporaneous independent

---

5. Defendant has since recalled Mr. Holler, who at the time of rebuttal testimony had returned to Cumberland and was unavailable to testify. Upon being recalled, Mr. Holler testified that the GP–9 on the particular train in question was a Western Maryland GP–9, which had had the long nose sawed off so that the visibility characteristics were essentially similar to those of the newer engines. Mr. Holler further testified that Mr. Clark did not request of him that the consist be rearranged so that he could use a newer engine for his test. Mr. Holler also testified that the consist was not rearranged for that reason, but only because of a malfunction of equipment or because the GP–9 in question was facing east coming out of Riverside and would have been facing backward traveling toward Brunswick. Rule 42 of the B & O's Management and Labor Agreement forbids the operation of locomotives backward except in emergencies and never at speeds over 15 miles per hour. Mr. Holler further testified that if a trainee had asked to change a GP–9 from the front of a consist in order to take the Qualifying Test, he would not have allowed it.

records of whether the questions were answered correctly or incorrectly by each trainee. Mr. Kirk and Mr. Holler testified that they compared scores at the end to determine the final score for each trainee. The testimony from Mr. Holler, who had also assisted Mr. Musick in administering the test, indicated that the way Mr. Kirk administered the test was not any different from the way he had observed Mr. Musick administer the test on other occasions. The material upon which the trainees were tested was information that the trainees in plaintiff's class, as well as prior classes and subsequent classes were required to know in order to operate trains in the territory to which they would be assigned. I find that the test items were objective, not subjective criteria. *See Grubb v. W.A. Foote Memorial Hospital,* 741 F.2d 1486, 1495 (6th Cir.1984). The examiners kept records of whether the examinees answered correctly and incorrectly, thus supporting the scores. Objective evidence supported the evaluations in the instant case. *Page v. Bolger,* supra, 645 F.2d at 230.

■ Even assuming there was some subjectivity involved in grading the tests, subjectivity alone is not fatal and is not sufficient to shift the burden of production to defendant. *Ward v. Westland Plastics, Inc., supra,* 651 F.2d at 1270. Even a lack of record-keeping is not a *prima facie* violation of Title VII. *Casillas v. U.S. Navy, supra,* 735 F.2d at 345. Nor does the fact that some subjective criteria may be involved in the employer's articulated reason for an employment decision *per se* prevent the articulated reason from being sufficient to rebut the *prima facie* case. *McDonnell Douglas v. Green, supra,* 411 U.S. at 803, 93 S.Ct. at 1824; *Casillas v. U.S. Navy, supra,* 735 F.2d at 345; *Anderson v. City of Bessemer City, N.C.,* 717 F.2d 149 (4th Cir.1982), *cert. granted,* — U.S. ——, 104 S.Ct. 3532, 1917, 82 L.Ed.2d 837 (1984); *Page v. Bolger, supra,* 645 F.2d at 230.

■ A subjective judgment to discharge an employee can be made for any non-discriminatory reason. *Grubb v. W.A. Foote, supra,* 741 F.2d at 1499. As the

Ninth Circuit stated in *Casillas v. U.S. Navy:*

> Title VII is the law's promise that employment decisions will not be based on nonpermissible discriminatory criteria, not that subjective criteria will be eliminated. [Wolfe] cannot render sound ... judgment illegal by labelling it "subjective."

735 F.2d at 345. Even if the evaluator's opinions as to the correctness of the examinees' answers was somewhat subjective, they were no more so than if the tests had been written essay tests. Absent other evidence of intentional sex bias on the part of the evaluators, the form of the test is not enough to carry plaintiff's burden.

Plaintiff's attorney attempted to make an issue of the fact that only plaintiff was required to prepare for a second OORE and a second Road Qualifying Test at the same time, and that the responsibilities of her job and the necessity for extra study were incumbent only upon her. However, there was no testimony or evidence that if a male trainee had failed both the Road Qualifying Test and the OORE for the first time that a male would not have been under the same constraints. It was the case in plaintiff's class that she was under greater constraints to study for the second OORE than the other three males who failed the first time because plaintiff was the only one who had also failed the Road Qualifying Test.

The treatment accorded plaintiff was strictly in accordance with Paragraph B of Article V of the Mediation Agreement, in evidence as Plaintiff's Exhibit 3–A. Plaintiff was accorded the opportunity to retake the examinations which she failed not earlier than 30 days and not later than 90 days after failure of the first. She was allowed to exercise her seniority during that time, but was permitted to sit in on any classroom instruction. In addition, her supervisors made themselves available to her for consultation on the rules. Ms. Wolfe chose not to avail herself of the offered assistance and attended only one conference during the ensuing two and one-half months.

Her failure to pass the second OORE resulted in her termination from service.

The employer gave a legitimate non-discriminatory reason for each employment decision of which plaintiff complained. In order to rebut the employer's explanation of why she failed the OORE, or why she was treated differently from some of the men on some occasions, plaintiff was required to show that the explanations were a pretext for sex discrimination. This the plaintiff has failed to do. There was absolutely no evidence of any sexually discriminatory animus on the part of either Mr. Kirk or Mr. Holler. The testimony in fact revealed that no other females who were accepted into the engineer training program had failed either the Road Qualifying Test or the OORE. Even plaintiff's own witness, Ms. Webb, indicated that Mr. Kirk had never treated her in a discriminatory fashion and had always been a "total gentleman" to her.[6] She also testified that she had no complaints about any of the engineers with whom she trained.

In an attempt to show that plaintiff's failure on the Qualifying Road Test was a pretext for sex discrimination, plaintiff offered the testimony of Ms. Webb, herself a promoted engineer, to the effect that Mr. Rayner had told her on one occasion that if he were ever General Road Foreman of Engines he would not have women engineers on the railroad. Ms. Webb further testified that she always had difficulties with Mr. Rayner. Mr. Rayner denied having made the alleged statements to Ms. Webb and testified that he took no exception to women engineers and that he in fact wanted Ms. Wolfe to be promoted.

Although there was some testimony that Mr. Rayner had harassed Ms. Webb, he denied it and there was no corroboration of any sex bias on Mr. Rayner's part. I do not find that anything that plaintiff was required to do on her Road Qualifying Test was as a result of intentional sex discrimination. In any case, the plaintiff's failure of the Road Qualifying Test did not result in her termination from the B & O because she would have had another opportunity to take that test if she had passed the OORE the second time.

If there is no other evidence of sex bias on the part of the evaluators, the court may accept their assessment of plaintiff's noncapability of passing the OORE. *Ward v. Westland Plastics, supra; Wright v. National Archives and Records Service, supra,* 609 F.2d at 714; *Kralowec v. Prince George's County, Md.,* 503 F.Supp. 985, 997 (D.Md.1980), *aff'd w/o opinion,* 679 F.2d 883 (4th Cir.), *cert. denied,* 459 U.S. 872, 103 S.Ct. 159, 74 L.Ed.2d 132 (1982). The fact that plaintiff may have known some rules in a study situation factually removed from the examination situation, as testified to by Mr. Usher, who apparently studied with plaintiff, is not relevant and cannot be considered. He was not plaintiff's supervisor and was not in a position to judge her competency on the rules. *See Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980); *Weidman v. Western Electric Company, Inc.,* 527 F.Supp. 263, 268, fn. 9 (D.N.C.1981); *City of Cleveland v. Cleveland Electric,* 538 F.Supp. 1227 (N.D.Ohio 1980). Neither is plaintiff's own perception of her knowledge of the rules to be considered. *Smith v. Flax, supra,* 618 F.2d at 1067. The more relevant and credible testimony on this issue was from Mr.

---

**6.** There was some testimony by another B & O employee, a yardmaster named Paula Gray, that she was deterred from entering into the Engineer Training Program while she was a B & O clerk after talking with Mr. Kirk at the personnel office, where Mr. Kirk explained the rigors of the training program and an engineer's life to potential trainees. Ms. Gray indicated that she decided not to enter the training program because of the risk that if she failed out of the program after entering, she would be terminated altogether from the B & O according to the contract. Ms. Gray indicated that her decision was based on the fact that the B & O policy was not to allow trainees to see their tests and personal considerations of the schedule she would have to meet if she made engineer. There was no testimony that Mr. Kirk told Ms. Gray anything different from what he told males who were prospective trainees. I do not believe Mr. Kirk intentionally tried to discourage Ms. Gray from entering the training program because she was a female.

Michael Wolfe, who took the test with plaintiff both times, and who testified that in his opinion, Ms. Wolfe did not do as well as the others during the tests and that Ms. Wolfe herself told him immediately after the tests, before the results were known, that she thought she had failed.

The court finds on the evidence that the decision not to promote the plaintiff was based on a good-faith, rational evaluation of the qualifications and abilities of the plaintiff to perform the duties required of a locomotive engineer. *See Brown v. Delta Airlines, Inc.*, 522 F.Supp. at 1232. Plaintiff has not shown to this court's satisfaction that the situations that she complained of during her training program were the result of intentional sex discrimination on the part of the B & O. It is not surprising in view of her background and the testimony of the psychologists as to her psychological make-up that she misperceived situations and read sex discrimination into them. Plaintiff's misconceptions of the defendant's actions toward her do not prove a case of sex discrimination. Judgement should therefore be entered for defendant. The court will enter a separate order granting judgment for defendant.